```
 1                 UNITED STATES DISTRICT COURT

 2                 CENTRAL DISTRICT OF CALIFORNIA

 3                             ---

 4       THE HONORABLE DALE S. FISCHER, JUDGE PRESIDING

 5

 6

 7   United States of America,        )

 8                     Plaintiff,     )

 9                                     )

10   vs.                              )   Case No. CR 05-316-DSF

11                                     )

12   William H. Nurick,               )

13                     Defendant.     )

14   _____  )

15

16

17            REPORTER'S TRANSCRIPT OF TRIAL PROCEEDINGS

18                          Day 4

19                  Los Angeles, California

20              Tuesday, September 13, 2011

21

22   Pamela A. Batalo, CSR, FCRR
     Official Reporter
23   Roybal Federal Building
     255 East Temple Street
24   Room 181-I
     Los Angeles, California  90012
25   (213) 687-0446
```

```
 1   APPEARANCES:

 2

 3     FOR THE GOVERNMENT:      UNITED STATES DEPARTMENT OF JUSTICE

 4                             TAX DIVISION WESTERN CRIMINAL

 5                             ENFORCEMENT SECTION

 6                             BY:  LORI A. HENDRICKSON

 7                             P.O. BOX 972

 8                             WASHINGTON, DC 20044

 9

10                             UNITED STATES DEPARTMENT OF JUSTICE

11                             BY:  MATTHEW J. KLUGE

12                             601 D STREET NW

13                             ROOM 7909

14                             WASHINGTON, DC  90004

15

16     FOR DEFENDANT:          LAW OFFICES OF MATTHEW J. LOMBARD

17                             BY:  MATTHEW J. LOMBARD

18                             2115 MAIN STREET

19                             SANTA MONICA, CA 90405

20

21

22

23

24

25
```

1     Los Angeles, California, Tuesday, September 13, 2011

2                        7:45 a.m.

3                         -oOo-

4                       (Jury Out)

5          THE COURT:  Good morning.  I got the message about the

6     jury instruction, and I have made revisions.  Now that I'm

7     looking at it, though, I don't know that it makes sense to have

8     these brackets in here around John Biber's name because the jury

9     won't know what that's -- I assume the brackets are because it's

10    not directly from the Indictment, but the jury won't know what

11    that is supposed to mean.

12          MS. HENDRICKSON:  Yes.  So I put the brackets there

13    for the Court to make that determination.  In the Indictment it

14    just says *his friend*, but from the testimony it's clear that it

15    is Mr. Biber.

16          THE COURT:  Mr. Lombard?

17          MR. LOMBARD:  No objection to that, your Honor.

18          THE COURT:  To what?

19          MR. LOMBARD:  To leaving it *John Biber*.

20          THE COURT:  I will take out *friend* and just have *John

21    Biber* without brackets?

22          MR. LOMBARD:  Yes, your Honor.  There's a question

23    whether he's a friend at this point.

24          THE COURT:  Is there anything else we need to talk

25    about before the jury comes in?

1           MS. HENDRICKSON:  Regarding the Genesis stipulation,

2   your Honor, when would you like us to read that to the jury?

3           THE COURT:  It's up to you.  I'm not sure whose case

4   it's in, but --

5           MR. LOMBARD:  I'd prefer to have it after Mr. Laffer

6   testifies.

7           THE COURT:  That's fine.

8           MR. LOMBARD:  With regard to Defense Exhibit 1013, I

9   would also offer it under a residual hearsay exception as well,

10  your Honor.

11          THE COURT:  Okay.  I don't think -- whether it's

12  business record is unclear.  To the extent I have discretion to

13  decline to admit it, I would.  I think more importantly, though,

14  it's just not relevant.  What Ms. Nguyen told Mr. Schulman in

15  2002 about what she said to Nanette Davis at an earlier time is

16  not relevant.  Even what she said to Ms. Davis is not

17  necessarily relevant.

18          What is relevant is what Ms. Nguyen told Mr. Nurick.

19  She testified fully about that subject.  He testified

20  consistently.  Is the government going to suggest otherwise with

21  regard to the testimony?

22          MS. HENDRICKSON:  No, your Honor.

23          THE COURT:  There's just no issue.  The memo isn't

24  relevant.  It could have been used to impeach her if she'd

25  testified differently, but she didn't, so it's more of a

1    relevance issue than anything else, and so I'm not going to

2    admit it.

3              MR. LOMBARD:  May I make a record, your Honor?

4              THE COURT:  Yes.

5              MR. LOMBARD:  Certainly what's relevant is

6    Ms. Nguyen's advice to my client, and what she's memorialized

7    here is what she told my client and her explanation as to the

8    basis for her advice.  Whom she told it to, yes, I understand

9    the Court's position, but certainly what she told him is the

10   issue.

11             I do think it's relevant, and the Court certainly has

12   discretion, and I do think any prejudicial nature is minimal

13   regarding the probative value of what it shows she told him.

14   And I would submit, your Honor, that the point is to the extent

15   it is relevant, that the point here is not to allow the jury to

16   have evidence that they can -- that's reliable and that's

17   trustworthy, and her testimony was replete with *I don't recall,*

18   *it was ten years ago, I don't know*.  I attempted to refresh her

19   recollection several times, and she admitted *it says that here*

20   at times, but the record is clear that it was a long time ago,

21   and certainly this is a document that she says she authored

22   close in time to when it was authored.  She is familiar with the

23   contents of it, and it would be a reliable and trustworthy piece

24   of evidence.  It wouldn't mislead them, and it does say what, in

25   fact, she told Nanette Davis what she advised her client, and so

```
 1    to that extent I would offer it as an exhibit.

 2         THE COURT:  Again, what she told Nanette Davis about

 3    what she said to Mr. Nurick is really only relevant to two

 4    things:  one, to refresh recollection if she didn't recall; two,

 5    to impeach if she had testified differently.  Again, the

 6    government is not going to make any issue of it.  I mean, you

 7    kept saying that she testified she didn't recall, but I don't

 8    think she said that about this particular issue.  I can go back

 9    and look.  I think when you started to ask her about this, she

10    said she did recall.

11         I think it's more problematic because if it came in at

12    all, it would come in completely redacted, except for that

13    paragraph.  Obviously the rest of it doesn't come in, so as I

14    said, I can go back and try to look at that testimony and see,

15    but I think when you started to ask her about this, she did say

16    she recalled this advice that she had given him.

17         MR. LOMBARD:  The part is that really, your Honor --

18    number two talks about checking Aztec Irrevocable Trust, and

19    certainly I do recall her testifying that there were too many

20    uncertainties and that she did advise him to answer no.  She did

21    testify to that, and I agree with that.

22         The part below that, however, is the more interesting

23    and relevant part because it explains the context -- puts in

24    context her reason on advising him that, and what she says is

25    Most Offer in Compromise applications take approximately six to
```

*nine months from the date an offer is submitted to be assigned*

*to a field office.  When the case is assigned to a field office,*

*the IRS agent assigned to the case will ask for updated*

*information and most recent supporting documentation; i.e., bank*

*statements, copies of paycheck stubs and proof of expenses.  I*

*advised Mr. Nurick if there were changes to be made, usually we*

*would have an opportunity to do so when the case is assigned to*

*an Offer in Compromise agent.*

Now, she didn't recall that testimony as it relates to answering question 19-F on the 433-A, which is --

THE COURT:  Did or did not?

MR. LOMBARD:  Well, that's the part that I was attempting for her to recall.

THE COURT:  But when you say *didn't*, you swallow the last part, so I never know whether you are saying *did* or *did not*.

MR. LOMBARD:  Oh, that's what she did not recall from my recollection of the examination.  She did say, *Generally speaking, yes, I advised him we could change something when the Offer in Compromise was submitted,* but I believe that was in connection with the omission of the truck on the 433-A form.  I do think it's -- it is somewhat hyper-technical of an issue, but at the same time, the Aztec account had a significant amount of money in it, and for it to be excluded from the Offer in Compromise is certainly a -- something the government will

```
 1   address and I will address, but it was based on her advice that

 2   it would be assigned because of the uncertainties, it would be

 3   assigned to -- once it was assigned to a revenue officer, then

 4   it could be addressed later.

 5            THE COURT:  It's not clear to me from this memo what

 6   that first couple of sentences in the second paragraph of 2

 7   means.  This could be what she was telling Mr. Schulman as

 8   opposed to what she told Mr. Nurick, because she doesn't start

 9   off that paragraph by saying, I advised Mr. Nurick that most

10   Offer in Compromise applications.  That looks like something she

11   was explaining to Mr. Schulman, presumably a non-tax lawyer, and

12   then she says, I advised Mr. Nurick if there were changes to be

13   made.

14            MR. LOMBARD:  I've made my record.

15            THE COURT:  Thank you.

16            Anything else before the jury comes in?

17            MR. LOMBARD:  Is there a cup I could have for water?

18            THE CLERK:  Yes.

19            THE COURT:  Sure.  I'm going to go make these changes.

20                        (Recess taken)

21                          (Jury In)

22            THE COURT:  Good morning.  Everyone is present.

23            Mr. Lombard, would you like to call another witness?

24            MR. LOMBARD:  Thank you, your Honor.  Defense calls

25   Martin G. Laffer to the witness stand.
```

| | |
|---|---|
| 1 | <u>Martin G. Laffer, was sworn</u> |
| 2 | THE CLERK:  Please step forward to the witness stand. |
| 3 | State your full name for the record and spell it. |
| 4 | THE WITNESS:  My name is Martin G. Laffer, |
| 5 | L-A-F-F-E-R. |
| 6 | THE COURT:  You may proceed. |
| 7 | MR. LOMBARD:  Thank you, your Honor. |
| 8 | <u>DIRECT EXAMINATION</u> |
| 9 | BY MR. LOMBARD: |
| 10 | Q.   Good morning, Mr. Laffer. |
| 11 | A.   Good morning. |
| 12 | Q.   Mr. Laffer, where do you work? |
| 13 | A.   I -- I work at -- as a partner in a CPA firm called Laffer |
| 14 | & Gottlieb in West Los Angeles. |
| 15 | Q.   How long have you worked for Laffer & Gottlieb? |
| 16 | A.   The firm was started in 1982. |
| 17 | Q.   Are you the *Laffer* in Laffer & Gottlieb? |
| 18 | A.   I am. |
| 19 | Q.   And what are the areas of practice that Laffer & Gottlieb |
| 20 | work in? |
| 21 | A.   Well, we're considered a forensic accounting firm.  We do |
| 22 | primarily litigation, forensic-type accounting, tax controversy, |
| 23 | and we have a very small tax practice.  We prepare maybe 150 tax |
| 24 | returns a year. |
| 25 | Q.   What did you do before going into private practice for |

Laffer & Gottlieb?

A.    When I graduated from college, I worked for KPMG for two

years, which is an international accounting firm, and then I

went to work for the IRS as a special agent or criminal

investigator with -- at that time it was the Intelligence

Division.  Now it's referred to as the Criminal Investigation

division.  And I did that for approximately nine years.

        And then for two years after that, I was working with

a tax lawyer doing some real estate syndication and asset

management, property management, and then in 1982, started my

practice, which evolved into Laffer & Gottlieb.

Q.    Do you have any advance degrees in taxes or tax accounting?

A.    Well, I have a Bachelor of Business Science degree from

Pace University, New York, and then I have a Master of Science

in business administration with an emphasis in finance from

Cal State Northridge.

Q.    Do you have any special licenses?

A.    Well, aside from a CPA license, which is issued by the

state of California, I have a designation by the American

Institute of CPAs.  It's called a CFF credential.  It's

Certified and Financial Forensic.  And then the American -- the

Association of Certified Fraud Examiners, I have a designation

as a Certified Fraud Examiner, CFE.

Q.    Have you given any lectures on any topics involving income

tax?

1   A.   Yes.

2   Q.   What kind of lectures have you given?

3   A.   Well, many years ago I taught tax law to IRS agents in

4   Glencoe, Georgia at the law enforcement training center, and

5   over the years, I've lectured on various tax topics, tax

6   procedures.  I do a lot of lecturing at Cal State Los Angeles at

7   their extension program, which is a program for continuing

8   education for CPAs and attorneys.  And I -- you know, I have

9   lectured to various business groups and to various law firms

10  about taxes and accounting matters.

11  Q.   Have you authored any documents regarding taxes?

12  A.   Yes.

13  Q.   What kind of documents have you authored?

14  A.   Well, I've written a number of articles, professional

15  articles about tax procedures.  I wrote an article advocating a

16  national tax amnesty program that was published in the

17  *Wall Street Journal* years ago and various topics.  The

18  California Society of CPAs has a website, and I have had a

19  number of articles published about the different tax issues.

20  Q.   Are you a member of any professional groups in your area?

21  A.   I belong to the American Institute of CPAs, the California

22  Society of CPAs, and I'm on a forensic litigation -- forensic or

23  litigation committee, state committee where I'm an officer of

24  the committee, and I'm the treasurer for two years.

25  Q.   Have you ever testified in court before?

```
 1    A.    Yes.

 2    Q.    How often have you testified?

 3    A.    I couldn't tell you.  When I was with the IRS, I used to

 4    testify as an expert witness similar to what Ms. Pugh did, and

 5    since being in private practice I have testified many times in

 6    federal court and state court.

 7    Q.    When is the first time you were admitted as an expert in

 8    federal court?

 9    A.    Probably in 1972 or '73.

10    Q.    Have you reviewed documents in the case of United States

11    vs. William Nurick?

12    A.    Yes, I have.

13    Q.    Have you listened to the testimony of the witnesses that

14    have taken the stand in this case?

15    A.    Yes.

16    Q.    Have you interviewed witnesses in this case?

17    A.    Yes.

18    Q.    Who have you interviewed?

19    A.    Well, I have interviewed -- I have spent a lot of time with

20    Mr. Nurick.  I spent some time with Jay Lashlee, and I am trying

21    to remember who else.  There were several other people.  They

22    may not have testified at the trial.

23    Q.    Did you interview Ms. Lyly Nguyen?

24    A.    Tried to, but I did not.

25    Q.    Why is that?
```

A.    She refused to meet with me.

MR. LOMBARD:  Your Honor, I would offer Mr. Laffer as an expert in taxability issues and tax procedures at this time.

THE COURT:  Any objection?

MS. HENDRICKSON:  No objection.

THE COURT:  All right.  He is accepted.

BY MR. LOMBARD:

Q.   Mr. Laffer, let me start with the concept of amending taxes.  Can you tell the jury what a taxpayer's duties and the outline of the procedures of taxes when you realize you have to amend taxes or there is a tax deficiency, I should say.

A.   There is a presumption that when an income tax return is filed, it is correct.  There is a procedure and forms by which you could amend an incomes tax return to make a change to it, to correct it, whether it's reporting additional income or reporting additional expenses or deductions.  However, there's no requirement, there's no duty -- there is no requirement for an individual to amend an income tax return.

Q.   What is the statute of limitations for an individual who is -- who notices there is a deficiency in his reporting of his income tax return?

A.   The civil statute of limitations to amend a tax return is three years.  If you filed a tax return within the past three years and you realize that you had additional deductions, you have three years in which to claim a refund for the overpayment

1     of the taxes.

2            And likewise, if the return is not audited by the IRS

3     within the three years, then it's deemed to be accepted as

4     filed.

5     Q.   What does *deemed to be accepted as filed* mean?

6     A.   Well, that after three years, it can't be audited.  And,

7     you know, everything I say there are exceptions to, but

8     essentially after three years, the IRS can't audit a tax return.

9     Q.   Did you prepare a schedule in connection with this case?

10    A.   Yes, I did.

11           MR. LOMBARD:  Court's brief indulgence?

12           THE COURT:  Sure.

13               (Counsel confer off the record)

14    BY MR. LOMBARD:

15    Q.   Mr. Laffer, I'm going to show you the stipulations to

16    admissibility of 1019.  That is Defense Exhibit 1019.  I have to

17    zoom in here.

18           Do you recognize this document?

19    A.   Yes, I do.

20    Q.   What is it?

21    A.   It's a schedule of payments from Genesis and -- to various

22    Nurick entities, as well as payments from Genesis to the person

23    that we've heard reference to, Andre Tinoco Arnoldo, and it

24    compares the amount that was paid to Mr. Nurick and his related

25    entities, comparing that to his tax return.

Q.   Who prepared this document?

A.   I did.

Q.   In preparing this document, what did you rely on to get these figures?

A.   Well, we summarized disbursements that we were able to find in the Genesis bank records and also deposits that Mr. Nurick made to his various entity accounts.  Mr. Nurick's records were more complete than the Genesis records.  As Ms. Pugh testified earlier, the records were incomplete and voluminous, and it was kind of a big mess, actually.

Q.   So could you explain to the jurors, starting from the left-hand side going right, row at a time, what we're looking at.

A.   Okay.  Well, the top section is captioned *Genesis Income*. And Mr. Nurick, as you know, had a number of entities, and this reflects by year the payments that we were able to -- that we were able to trace from Genesis into the various accounts.  So, for example, in 1995, I show that this I-Control NB Account Trust received $78,362.03.  And in '98, it was 32,000.  The other entities, particularly NG Enterprises, didn't receive anything until 1999, at least what we were able to trace.  And you can just go along the chart.

          In 2001, there were payments to the Aztec Irrevocable Trust.  That's in 2000, 2001, and then in 2002, TaxLawServices.com, Inc., which is Lyly Nguyen's company, that

1    was the name of her company, her law practice, there was an

2    account that was set up in trust for Aztec.  That received

3    $127,000 in 2002.

4            And then the next section is monies that were received

5    for the sale of Genesis' interest that when Mr. Nurick divided

6    up his interest in Genesis, between two-thirds that he sold to

7    this Andre Tinoco and one-third that was actually the Aztec

8    account, that was his one-third interest, the remainder

9    interest, and the payments from Genesis -- I'm sorry -- the

10   payments that -- that Mr. Nurick received from Andre Tinoco for

11   the sale of his Genesis interest started out in 1999, there were

12   some third-party checks that Mr. Nurick asked Tinoco to write

13   payments to.  I believe those were out of the Luna account.  So

14   there was $21,000 of checks paid to third parties.  And then in

15   19 -- in 2000, Mr. Tinoco paid a total of $261,000 to Mr. Nurick

16   through Nurick & Associates, to his wife Eleanor, to Nurick's

17   personal account, some additional checks paid to third parties,

18   and then there was a cash payment on October 10, 2000, to Nurick

19   for $10,000.

20           So we were able to trace those so the first part is

21   the income from Genesis to Nurick or Nurick-related entities,

22   and the second part are the payments from Tinoco to these -- to

23   these Nurick entities.

24           And then the part down here, the third part -- I'm

25   not -- here it is.  The third part -- and it's hard for me to

```
 1    read.  It's kind of fuzzy up here so I'm reading my chart in my
 2    book.  But this third part are payments that Genesis made to
 3    Tinoco and -- vis-à-vis this Luna de Los Crestones account, and
 4    I have that broken out.  That began in 1999, and we broke it
 5    out.  There was a Luna account, the Interfin or Banco Interfin
 6    in Costa Rica, there were payments made in '99, 2000, 2001, and
 7    then there was a Luna de Los Crestones in Belize, and there were
 8    payments made in 2001 and 2002.  So that's the disbursement part
 9    or the income part that was disbursed out to Nurick or to
10    Tinoco's entity.
11           And then on the bottom part of the chart, right --
12    right here -- it's like trying to hit a moving target here.  On
13    this part right here, this is the Genesis-related income that
14    was reported on Mr. Nurick's tax returns, and he began reporting
15    the income in 1999 --
16    Q.   Is that right here?
17    A.   That's -- yes.  The $285,000 that was the income in 1999
18    that Mr. Nurick reported.  Schedule D is where you report
19    capital gains.  So that was the $285,000, and then the
20    Schedule E is for partnerships, S corporations, trust accounts,
21    and I believe that in -- in 2001 and 2002 -- let's see.  2002
22    and 2003, sorry, that on his Schedule E he reported income from
23    these pass-through trusts on his Schedule E, and so that was
24    reported.  That was Genesis related as well.
25    Q.   Is that right here?
```

A.    Yes.   That's the $107,000 and the $9,200.   And then in

2001, he reported $11,646 as other income from Aztec, and that

was reported as ordinary income on his tax return.   I think that

should have been a capital gain.

        But basically if you look at the schedule, there is a

squiggly line and an A in the total column on the right-hand

side which is totaling up the amount of income Mr. Nurick

received from Genesis, which the total for the -- all of the

years in the entities was $579,000.   Go down.   No.   The other

way down.   There you go.   This number right here -- -- down a

little more.   No.   Down.   Down, down.   You're going up.

Q.    Okay.

A.    Okay.   Stop.   Okay.   So the total that was paid to Nurick

and his related entities for all of these years that I was able

to trace -- and I believe my numbers are slightly higher than

the government's, but I don't think it really matters, but he --

you told me if I circle this thing, it's going to circle.   The

579,000 -- it's the fifth number down on the right-hand side.

There you go.   So that's the total that was paid to Nurick or

Nurick-related entities from Genesis.

        Then underneath that, the $294,000 -- there you go --

the $294,000 is what Mr. Nurick received from Tinoco for his

sale of the two-thirds interest that he had in this Genesis Fund

investment.

Q.    Did Mr. Nurick ever tell you how much he sold his interest

1   in Genesis to Mr. Tinoco for?

2   A.   Yes.

3   Q.   How much?

4   A.   For 300,000, but I was only able to trace 294,000.  So

5   Nurick received from Genesis 579.  He received from Tinoco for

6   the sale -- it was through the Luna account -- 294,000 so the

7   total that Mr. Nurick received for this investment was 5 -- from

8   Genesis was $873,838.55, which is the total of these two

9   components, monies that he got from Genesis, monies that he got

10  from Tinoco.

11        Then this next total down here, this next section is

12  the total of the Genesis payments to Andre Tinoco, and that

13  began in 1999, and we didn't have all of those accounts either,

14  all of those records, but it looks like Tinoco received

15  540,171.22.  So the total that Genesis paid out to Nurick and to

16  Tinoco, who I believe is an unrelated entity, was $1,363,000.

17        Now, if we go to Mr. Nurick's tax returns, which now

18  you need to lift it up a little, this chart -- yes.  Okay.  So

19  if you look at what was reported on Schedule -- on Schedule D,

20  there was $602,000 reported right here on Schedule D, and then

21  on Schedule E there was $116,000, and then miscellaneous income,

22  there was $11,000, so the total that was reported by Mr. Nurick

23  as having received from this investment in Genesis was $731,000.

24  Q.   Does that mean he would have paid taxes on that investment?

25  A.   Yes.

```
1   Q.    On $731,000?

2   A.    Yes.

3             Now, if you -- if you add up -- if you go back up to

4   my little squiggly A up here, which is a footnote reference, the

5   $873,000, if you subtract out what's called basis -- you know,

6   like if somebody buys stock.  If you bought stock in a company

7   for $100 and you sold it for $150 on your tax return, you would

8   report a sale of 150, and your basis or your cost would be $100

9   so there would be a gain or taxable would be the $50.  And

10  that's what Mr. Nurick did here.  He received $873,000, and then

11  his basis from the retirement accounts -- we heard about the IRA

12  rollover accounts that was $349,750, so that's his basis because

13  that was his money from the retirement account that got rolled

14  into Genesis plus in 1994 when he became part of this formation

15  group called The Human Element, he invested, along with these

16  other guys that founded it -- he invested $10,000.  So he should

17  get credit for that.  So the amount of gain -- I'm sorry.  The

18  amount of his basis should have been 359,000.  Okay.  It's the

19  money that he invested through these rollover accounts plus the

20  10,000.

21            So the gain on the sale of this Genesis investment,

22  you would subtract out from the $873,000 over here -- you would

23  subtract out the $359,000 of basis, and his gain would be -- the

24  reportable gain would be $524,000.

25            Now, if you go back up to this number here and you
```

```
 1   look at what he reported over the years on his tax return, he
 2   actually reported gains of $731,000.  So for purposes of my
 3   chart, I caption this that he over-reported, but I'm not
 4   representing that he over-reported.  I just don't have all the
 5   information.  What I'm saying is the gain he had was $524,000.
 6   He reported $731,000.  So as far as I'm concerned, from what I
 7   could see, he reported all of his Genesis-related income.
 8   Q.   Let me direct your attention -- let me erase these
 9   squigglies.  Let me go up to the top of the chart.  Before I do
10   that, let me go to the second page.
11        What is this -- did you prepare this?
12   A.   I did.
13   Q.   What is this?
14   A.   Well, this shows the amount of the tax on the original tax
15   returns, then the additional tax as a result of the amended
16   returns that were filed that were prepared by Tony Lam, and then
17   the total amount of tax for each one of the years.
18   Q.   Let me go back to the first page.
19        All right.  At the very top here, do you see where I
20   have circled here?
21   A.   Yes.
22   Q.   In 1995 Mr. Nurick rolled his retirement account over into
23   Genesis.  Why doesn't that number, what he rolled over, show up
24   in that column?
25   A.   Well, again -- this schedule is for monies that were
```

1    received by the Nurick-related entities from Genesis.  It has

2    nothing to do with what he invested.  It has nothing to do with

3    the basis.  That's a different -- it's a different issue.

4    Q.   So the $78,000 is -- would it be fair to say that

5    represents the income from the investment of his rollover?

6    A.   Right.  That's the amount that Genesis paid to this

7    I-Control NB Account Trust which, as I understand it, was set up

8    by Jay Lashlee as the rollover account for the investment in

9    Genesis.  So the IRA money went from Fidelity and Charles

10   Schwab, and Lashlee had Mr. Nurick sign a form requesting

11   disbursement of the funds, and then it was -- this account was

12   set up and that was like the transition account for Lashlee when

13   he got the money and invested it in Genesis.  So this is like

14   the new IRA rollover account, this I-Control NB Account Trust.

15   Q.   So this would not -- if it was a rollover account, then

16   this would not be taxable; is that correct?

17   A.   That's correct.  If you look at the bottom of this

18   schedule, right down in here, you could see that he didn't

19   report any income for '95, '96 -- I'm sorry.  '95, '6 -- well,

20   '7, there is nothing.  1998.  So for those three years, there

21   was no income reported.

22   Q.   Are you referring to right here?

23   A.   Yes.  Right in there.  There was no income -- there was no

24   income reported for those years, and those were the years

25   that -- from the -- from my discussions and from what I could

1    see, it was Mr. Nurick's belief that this was money that was

2    being paid into his retirement account by Genesis, which is

3    reflected up on top, which would not be taxable and would not be

4    reportable on a tax return.

5    Q.   Now, you said you interviewed Mr. Lashlee.  What did you --

6    tell the jurors, based on your interview with Mr. Lashlee, what

7    did you discover regarding the rollover accounts that he had

8    created for Mr. Nurick?

9    A.   Well, Mr. Lashlee -- actually, he was -- he had this

10   company called Professional Trust Services down in Laguna, and

11   he actually had an office at a Wells Fargo branch down in Laguna

12   Niguel, and people were being referred to him to set up these

13   trust accounts, so he was setting up these IRA rollover

14   accounts, and he was setting up trust accounts by the pound, and

15   his theory was that, as he expounded to me -- was that --

16           MS. HENDRICKSON:  Objection, your Honor.

17           THE COURT:  Sustained.

18   BY MR. LOMBARD:

19   Q.   Well, what's your opinion, based on Mr. Lashlee's theory,

20   as to why -- what's your opinion, having talked with Mr. Lashlee

21   and looked at the records and looked at the rollovers regarding

22   the retirement accounts that he set up on behalf of Mr. Nurick?

23           MS. HENDRICKSON:  Objection.  Lack of foundation.

24           THE COURT:  Sustained.

25   BY MR. LOMBARD:

1   Q.    You spoke with Mr. Lashlee?

2   A.    I did.

3   Q.    Based on your conversation with Mr. Lashlee -- well, did

4   you review documents in this case?

5   A.    I did.

6   Q.    Did you review the 1099-Rs in this case?

7   A.    Yes.

8   Q.    What is a 1099-R?

9   A.    A 1099-R is a tax form that is issued by a disbursing

10  company from a retirement account, and it's the form that, in

11  this specific case, Fidelity Investments issued to Mr. Nurick

12  showing a gross amount of distributions from his IRA account and

13  then designating that the taxable amount of the distribution was

14  zero.

15  Q.    Based on the documents you looked at, the 1099-R, and the

16  discussions with Mr. Nurick and Mr. Lashlee, what's your opinion

17  as to the rollover that Mr. Lashlee created?

18  A.    I -- I saw nothing in the -- in the evidence that indicated

19  that the IRS disallowed the rollover or these IRA rollover

20  accounts that Lashlee set up.  So in my mind, there may not have

21  been any reason to amend the tax returns to report that the

22  rollover was actually taxable because I never saw any kind of a

23  determination letter, audit or anything with respect to Lashlee

24  or specifically with respect to Mr. Nurick saying that it was an

25  improper rollover of the IRA account.

1    Q.    What are the kind of documents that you see or review when

2    you -- first of all, are you aware of how the IRS notifies a

3    person whether or not they are a proper IRS custodian for a

4    rollover?

5    A.    You know, I've researched that, and I'm not aware of a list

6    that says that these are proper custodians of accounts.  It may

7    be out there, but I extensively looked at the IRS website trying

8    to determine if in fact Lashlee or anybody else would be, you

9    know, an authorized or proper custodial person for these

10   accounts, and I haven't been able to find anything.

11   Q.    Well, Denise Taylor-Fraser -- do you recall her testimony?

12   A.    Yes.

13   Q.    She mentioned something about whether or not you exercised

14   control over it.  Do you recall that part?  Whether or not it's

15   a valid rollover or not?

16   A.    I remember she said something about that, and she wrote a

17   memo regarding that.

18   Q.    I'm showing you what's been admitted as Government's

19   Exhibit 356, the first page of it.  Do you recall this exhibit?

20   A.    Yes, I do.

21   Q.    And what is that?

22   A.    It's like a tax opinion letter about the taxability of

23   Genesis Fund distributions.

24   Q.    And this is the one that Ms. Taylor-Fraser indicated that

25   she co-authored; right?

```
 1   A.    Yes.

 2   Q.    Did you review this document?

 3   A.    I did.

 4   Q.    What's your opinion of this document?

 5   A.    It's a great document.  It says that distributions from

 6   Genesis are taxable, but it doesn't address the fact that if

 7   somebody owns their interest in Genesis through a retirement

 8   account, it wouldn't be taxable because just like anybody here

 9   who has a retirement account and there is gains or losses or

10   whatever transactions are in that retirement account, those

11   transactions are simply contained within the retirement account

12   and they're not something that goes on a tax return.  They're

13   not reportable on a tax return.

14         A retirement account doesn't become taxable to you

15   until you take it out.  You know, the exception is a Roth

16   retirement account, a Roth IRA, because you don't get the

17   deduction on your tax return when you fund it and it's not

18   taxable when you receive it, but on typical IRA's -- and I don't

19   know what the ratio is now with the Roth to the traditional, but

20   on a traditional IRA account, you make a contribution, you get a

21   deduction on your tax return, and then once you start taking

22   money out of your retirement account, that's when it becomes

23   taxable.

24         So she's not addressing that in her -- this opinion

25   letter or memo or whatever you want to call it, and so I don't
```

1   think it's applicable in this situation.

2   Q.    The government showed, throughout this trial, a number of

3   checks and bank accounts to the witnesses.  Are those the same

4   checks and bank accounts and withdrawals that you relied on in

5   preparing your spreadsheet?

6   A.    Well, I have a book of all of these which is -- it's -- I

7   think it's a little more extensive than what the government had,

8   but our numbers are very similar.  I mean, there is no material

9   discrepancy in the numbers.  I think theirs are a little lower,

10  mine are a little higher, but they're basically the same

11  numbers.

12  Q.    Let me show you what has been admitted as Government

13  Exhibit 400.  Is your analysis any different -- first of all,

14  what is Exhibit 400?

15  A.    This is a chart from Ms. Pugh of the Genesis funds that

16  were -- that were deposited to this I-Control NB Trust for 1995,

17  and it shows a total of $24,980.53 as being received by this

18  I-Control account.

19  Q.    Are your numbers any different?

20  A.    I'm showing -- I'm showing a total of $78,362, so I'm

21  basically showing $54,000 more than the government's chart.

22  Q.    I'm showing you what's been admitted as Government

23  Exhibit 401.  Do you recognize this?

24  A.    Yes.

25  Q.    What is this?

1   A.    This again is a deposit from Genesis to this I-Control

2   account for 1996, which shows $3,584 having been received.

3   Q.    This is reflected in your schedule?

4   A.    I reflect $32,000 as having been received.  $32,856.

5   Q.    I'm showing what has been admitted as Government

6   Exhibit 402.  What is this?

7   A.    This again is deposits from -- or Genesis deposits

8   deposited to the I-Control account for 1998 showing $137,854.

9   Q.    Is your schedule any different from this?

10  A.    I'm showing 150,987 having been deposited to the I-Control

11  account.

12  Q.    I'm showing you what has been admitted as Government

13  Exhibit 403.  What is this?

14  A.    Again, this is the same chart showing deposits to various

15  accounts.  However, it's kind of a salad bowl here because it's

16  mixing up all of the accounts.  I isolated the accounts and

17  segregated the deposits.  This is showing a total of, I think

18  it's $266,880, but it also includes deposits to Luna de Los

19  Crestones, which the government -- the government's position is

20  belongs to Mr. Nurick and my position is that it does not.

21        So for 1999, I'm showing 41,000 to the I-Control

22  account and 123 to NG Enterprises, so this is NG over here,

23  here, and here, and then down on the bottom, but I'm not

24  showing -- I'm showing the payments to Luna de Los Crestones,

25  but I'm showing it as -- on the third section of my chart as

1    going to Tinoco.

2    Q.    I'm showing you what has been admitted as Government

3    Exhibit 404.  Do you recognize this chart?

4    A.    Yes.

5    Q.    What is this?

6    A.    Same thing.  It's payments from Genesis to the various

7    entities, and again, you know, they have the Luna account in

8    here, the 63,000, and I think -- I'm showing the 63,000 on my

9    chart as going to -- to Tinoco, and I'm showing these other

10   payments as going to either the I-Control or payments from

11   Tinoco to Mr. Nurick.

12   Q.    And what's been admitted as Exhibit 405 I'm now showing

13   you.  What is this?

14   A.    Well, again, same thing for 2001.  It's payments to Eleanor

15   Grochowski to Aztec and then to these Luna accounts.  The total

16   being $230,000 for 2001, and I'm showing a total of 320 -- I'm

17   sorry -- $351,000 as being paid, but of that, $327,000 went to

18   Luna and I do not believe are reportable by Mr. Nurick.

19   Q.    I'm showing you what's been admitted as Government

20   Exhibit 406.  What is this?

21   A.    406, that's -- okay.  That's again Genesis to -- this is to

22   Tax Law Services, Inc., for 2002, and it's $127,000, which I'm

23   showing in the top section of my chart as TaxLawServices.com,

24   Inc., in trust for Aztec.  That went into the Bank of America

25   account that Lyly Nguyen was the signer on.

1  Q.   What did you learn through -- as the source of the income

2  or the money, I should say, from Tax Law Services?

3  A.   Well --

4  Q.   In the -- ITF, Aztec Trust, I should say?

5  A.   Okay.  The Aztec Trust was -- was Mr. Nurick's vehicle for

6  holding his one-third remainder interest after he sold

7  two-thirds interest to Tinoco, so the money that came into this

8  Aztec Trust, when Lyly Nguyen had it and after -- or before

9  that, I'm sorry, was income from Genesis that was distributed

10  out because that was his interest in Genesis as opposed to the

11  other two-thirds that was Tinoco's interest in Genesis.

12  Q.   Who was the trustee for Aztec before Lyly Nguyen?

13  A.   There was a lawyer down in Laguna Beach by the name of

14  Kevin Mirecki who, as I understand, established the trust

15  instrument and was the trustee of the Aztec Irrevocable Trust.

16       MR. LOMBARD:  Court's indulgence.

17       THE COURT:  Sure.

18  BY MR. LOMBARD:

19  Q.   I'm showing you what has been admitted as Government's

20  Exhibit 407.  What is this?

21  A.   This is a summary of the amount of funds that were

22  disbursed by Genesis -- well, it says received by William

23  Nurick, but it also includes the monies that were sent to Luna

24  de Los Crestones or to Tinoco, so this total of $1,095,000 when

25  compared to my schedule, which would be all of the disbursements

1    that we've accounted for, I am showing $1,360,000.  But of the

2    amount that I'm showing, $540,000 should be attributable to

3    Tinoco through this Luna de Los Crestones.  So this chart is a

4    total, but I don't believe it's correct.

5    Q.    I'm showing you what has been marked and admitted as

6    Government Exhibit 408.  What is this?

7    A.    These are the -- the amounts received per year, and again

8    that's the $1,095,000 that we looked at previously, and the

9    amount that Mr. Nurick reported of $742,000, and I'm showing

10   that he reported $731,000.  I'm not showing the $742,000, but

11   again the $1,095,000 includes the disbursements to the Tinoco

12   entity which I don't believe should have been designated as

13   having been received by William Nurick.

14   Q.    I'm showing you what has been marked and admitted as

15   Government Exhibit 409.  What does this chart show?

16   A.    This chart is showing the balances in the various accounts

17   that Mr. Nurick had at the time that this Offer in Compromise

18   was submitted and the Form 433, that individual financial

19   statement form for the IRS, was prepared, so it's showing the

20   balances in each account.

21   Q.    Now, when the Offer in Compromise was filed, what's your

22   understanding as to what Mr. Nurick's assets were at that time

23   based on this chart?

24   A.    Okay.

25   Q.    Or based on your understanding using this chart?

A.    Okay.  My understanding is that he had this Clovis account

for the $5,400.  My understanding is also that he had this Wells

Fargo account for the $7,500.  The Aztec account, that was an

account that I believe Ms. Nguyen testified she was aware of but

didn't think it was reportable because of this nebulous control

issue that she said Mr. Nurick was confused about, so that

wasn't reflected on the 433-A, and I'm not -- you know, I'm not

sure why she didn't report it, but she didn't.

         This Ansbacher account, this NG Enterprises, those

funds were disbursed out to Mr. Biber before this financial

statement was prepared, so that was no longer in Nurick's

account, and then again this Luna de Los Crestones account at

Banco Interfin, I believe that that was not Mr. Nurick's money.

It was not his account.  He was never a signer on the account.

And as far as I know, the only signer was Tinoco, and Mr. Nurick

had a credit card or something related to that account, but it

wasn't his.

Q.    So what would be the funds available to pay the IRS on

April 19, 2001, based on your understanding of this chart?

A.    Well, it would be these -- these two numbers.  It would be

approximately $13,000.

Q.    Let's talk about how to pay -- well, let me start with

amending the returns.  So you've said that you -- from your

understanding, there's a question as to whether or not the

return of 1995 ever had to be amended; right?

1   A.   Yes.

2   Q.   And why is that?

3   A.   Well, for two reasons.  I believe that there was a question

4   at the time as to whether or not that IRA rollover was valid or

5   not, and just based on that issue alone, I think there's a

6   question about whether the return should have been amended.  And

7   secondly, the statute of limitations already ran on that 1995

8   year, so he had -- again, there's no duty to amend a tax return,

9   but beyond that, the statute had expired on that year.  So I

10  would have not recommended to Mr. Nurick that he file an amended

11  return on a year that was -- that was closed by statute.

12  Q.   So we know in this case -- who suggested that Mr. Nurick

13  amend his returns or advised Mr. Nurick to amend his returns?

14  A.   My understanding is that Lyly Nguyen made that

15  recommendation.

16  Q.   And by doing -- by amending his '95 returns, what occurred

17  as a result?

18  A.   Well, here we are.  What occurred as a result was that he

19  filed an amended return, a 1040-X, which generated a tax

20  liability of $106,000, based on the tax on the $270,000 of

21  distributions, and another 56,000 or 53,000, something like

22  that, of penalties for the late payment of the return.

23  Q.   How is interest and penalties calculated for a tax

24  liability when it's incurred?

25  A.   Well, penalties are five percent a month on late filings or

```
 1    late payments for a total of five months or 25 percent, and then
 2    there is a half a percent a month thereafter.  The interest
 3    is -- changes -- I think it's every six months or every quarter.
 4    The interest rate that the IRS charges and also that the IRS
 5    pays on refunds, that changes, and I don't know what it was back
 6    in '95 to '99 or 2000 when it was filed, but it -- for a long
 7    time it's been six percent, and I think right now they just -- I
 8    just got a notice from the IRS that it was reduced to four
 9    percent.  But it varies over the years.  I think at one point it
10    was as high as 14 or 16 percent, years ago.
11    Q.    Now, you heard Ms. Nguyen indicate that she advised
12    Mr. Nurick of three ways to satisfy his tax liability.  Do you
13    recall that?
14    A.    Yes.
15    Q.    And what were they?
16    A.    Well, one way is --
17              MS. HENDRICKSON:  Objection, cumulative.
18              THE COURT:  Sustained.
19    BY MR. LOMBARD:
20    Q.    Well, you heard Ms. Nguyen testify that she advised him to
21    file an Installment Agreement.  Could you tell the jurors what
22    is an Installment Agreement and how it's determined.
23    A.    Okay.  An Installment Agreement is an agreement.  It's a
24    form that you submit requesting to pay out your taxes over a
25    period of time.  And it's usually based not -- not usually, but
```

```
 1   it's always based on your financial situation.  So if somebody
 2   incurs a tax liability, whether it's on an original return or an
 3   amended return and they can't pay it right away or they don't
 4   want to pay it right away, they could ask for an Installment
 5   Agreement to pay it out over a period of time.  I mean, there's
 6   all these different parameters that are looked at by the IRS.
 7   You know, normally they want it paid off within six months but
 8   sometimes they'll go to 12 months, and then under the
 9   circumstances they may agree to an Installment Agreement with
10   different payment amounts, you know, stepped up.  The IRS always
11   has a right to reevaluate the Installment Agreement based on
12   your current financial situation, but there is --
13           MS. HENDRICKSON:  I am going to object to the
14   narrative answer.
15           THE COURT:  I think we are going far afield of
16   anything relevant to this case, Mr. Lombard.
17   BY MR. LOMBARD:
18   Q.   How does the IRS determine whether or not the Installment
19   Agreement -- well, in this case, you know Mr. Nurick signed an
20   Installment Agreement.  Did you review that document?
21   A.   Yes, I did.
22   Q.   And what was the amount he listed as a monthly payment to
23   satisfy the installment request?
24   A.   $500 a month.
25   Q.   How does the IRS determine whether or not that amount -- or
```

1   how they would, based on your experience, determine whether that

2   amount is an appropriate amount to pay over time?

3   A.   The determination is based on the same documents that was

4   submitted with the Offer in Compromise, but I didn't see it as

5   part of the Installment Agreement in Ms. Nguyen's files.  It's

6   the 433-A and the 433-B.  So the taxpayer has to fill out their

7   available assets, liabilities, their monthly income, and then

8   monthly expenses within certain parameters, like housing and

9   living expenses.  There are parameters for it.  It's not just

10  what you're paying.  It's what -- what will be allowed.  It's

11  called the national standards.

12          So that 433-A and B, if you have your own business, is

13  supposed to be submitted with the form -- with the request -- a

14  9542, whatever the form is, requesting the right to make an

15  Installment Agreement.

16  Q.   In this case there was a Power of Attorney that was signed

17  by Mr. Nurick.  Do you know, based on your experience, whether

18  or not a Power of Attorney signature would allow a taxpayer's

19  representative to file an Installment Agreement?

20          MS. HENDRICKSON:  Objection.  Speculation.

21          MR. LOMBARD:  I can lay a foundation.

22          THE COURT:  All right.  Thank you.

23  BY MR. LOMBARD:

24  Q.   Mr. Laffer, have you filed an Installment Agreement request

25  before?

1    A.    For clients, yes.

2    Q.    How many have you filed?

3    A.    100, 200, I don't know.

4    Q.    How about Offer in Compromise, have you ever filed an Offer

5    in Compromise on behalf of a client?

6    A.    Yes.

7    Q.    How many?

8    A.    Maybe two dozen, 18 to two dozen over the years.

9    Q.    And in filing the Installment Agreement request and the

10   Offer in Compromise requests on behalf of your clients, have you

11   done so on behalf of a Power of Attorney?

12   A.    Well --

13         THE COURT:  Rephrase that question.

14   BY MR. LOMBARD:

15   Q.    Have you ever exercised -- have you ever filed an Offer in

16   Compromise with the authority given to you through a Power of

17   Attorney?

18   A.    Yes.

19   Q.    Have you ever filed an Installment Agreement request

20   through a Power of Attorney given to you by a client?

21   A.    Yes.

22   Q.    How many times?

23   A.    Well, again, you know, every -- whenever you represent a

24   taxpayer before the IRS, you must file a Power of Attorney, the

25   Form 2848.  And it has to be specific for the type of tax and

1    the years that you're representing the taxpayer for.

2          Without that, the IRS won't acknowledge the existence

3    of a taxpayer.  So whenever there's an Offer in Compromise or an

4    Installment Agreement request or anything, with a third party

5    like me dealing with the IRS on behalf of a client or a

6    taxpayer, you have to have the Power of Attorney or they won't

7    talk to you.

8    Q.   Describe to the jury what the process is when a taxpayer

9    representative files an Offer in Compromise with the IRS.

10   A.   The process is -- the normal procedure is to file the Power

11   of Attorney.  The IRS has what they call the Centralized

12   Authorization File Unit, which is at the Ogden service center.

13   So all powers of attorney reside within the CAF unit, and once

14   filed, then the IRS from -- wherever it is, you know, various

15   offices, revenue offices, revenue agents, they could access the

16   information on that CAF unit to show that an individual is

17   empowered or authorized to represent the taxpayer for the

18   particular years and type of tax.

19         So the normal process is to file the Power of Attorney

20   first, get it recorded, and then the Offer in Compromise would

21   be submitted either to a revenue officer who is involved in the

22   case or to the service center.  Right now the procedure is that

23   all offer in compromises --

24         MS. HENDRICKSON:  Objection.

25         THE COURT:  Right now is not relevant.

```
 1              THE WITNESS:  Okay.  Well, I'm not --
 2              THE COURT:  Don't argue with me, sir.
 3              Mr. Lombard, would you ask another question.
 4   BY MR. LOMBARD:
 5   Q.   Mr. Laffer, in reviewing the evidence in this case and
 6   based on your experience of having filed Installment Agreement
 7   requests in the past and working as a revenue agent, is this the
 8   kind of case that installment requests would be appropriate for?
 9              MS. HENDRICKSON:  Objection.  Speculation.
10              THE COURT:  Overruled.
11              THE WITNESS:  So now we are switching to Installment
12   Agreement.
13              So from the testimony, Mr. Nurick said that he was
14   making approximately three percent a month on his investment in
15   Genesis.  And I know that approximately, say, one percent, a
16   half a percent penalty and a half a percent interest or maybe a
17   little more than that on the interest factor because it's a
18   variable, but if he's paying, say, one, one and a half percent
19   for the tax liability but he's receiving three percent back on
20   this investment, then from a financial standpoint, it makes
21   sense to do an Installment Agreement request so that you could
22   keep as much of the corpus or the principal together in your
23   investment.  That would be -- that would be my analysis on
24   behalf of the taxpayer or on behalf of my client.
25   BY MR. LOMBARD:
```

1    Q.    Let me turn your attention to the Offer in Compromise.

2    Based on your experience of having filed -- requested Offer in

3    Compromises and being a revenue agent, would you suggest or

4    advise that a taxpayer use an Offer in Compromise in this

5    situation?

6    A.    No.  But I was never a revenue agent.  I was a special

7    agent.  I was in the criminal division.  But as a practitioner,

8    I deal with revenue officers on Offer in Compromises and

9    Installment Agreements.  But I don't believe that Mr. Nurick was

10   a candidate for an Offer in Compromise.

11   Q.    And why is that?

12            MS. HENDRICKSON:  Objection.  Relevance.

13            THE COURT:  Overruled.

14            THE WITNESS:  Well, he had this Genesis, you know --

15   this investment in Genesis, you know, vis-a-vis the I-Control NB

16   Trust and this Aztec, and he had sufficient money in there to

17   where he would not have qualified to do an Offer in Compromise

18   because an Offer in Compromise is where the revenue officer or

19   the officer specialist with the collection division of IRS

20   evaluates whether or not it's in the best interest of the

21   government to take some amount less than what's owed, and the

22   evaluation is based on how much can they get from this guy

23   either by forcing him to liquidate assets or on a monthly

24   Installment Agreement, and there's a formula that's used.

25   Basically if they can get an amount per month off of the 433-A

1    on an Installment Agreement, the IRS multiplies that by 48

2    months and then adds whatever net equity and assets the taxpayer

3    has, and they compare that to the amount of the tax liability,

4    and I believe that if Ms. Nguyen had looked at that, she would

5    have realized that an offer would have never been accepted.

6            MR. LOMBARD:  Thank you.

7            No further questions at this time.

8            THE COURT:  Ms. Hendrickson?

9            MS. HENDRICKSON:  Yes, your Honor.

10                    CROSS-EXAMINATION

11   BY MS. HENDRICKSON:

12   Q.   Good morning, Mr. Laffer.

13   A.   Good morning.

14   Q.   I'd like to direct your attention first to the last

15   statements you were just talking about, the financial statement

16   that would have been attached to the Offer in Compromise.

17   A.   Yes.

18   Q.   Isn't it true that if the person does not report most of

19   their assets to the IRS, then the IRS is going to have a very

20   false impression of their ability to pay; correct?

21   A.   Yes.

22   Q.   If we could turn to Defense Exhibit 2, do you recall this

23   document, Mr. Laffer?  Let me show you the bottom part.  It's a

24   signature by Ms. Nguyen.

25   A.   Yes.

1    Q.    Going back to the top, it's Ms. Nguyen's letterhead dated

2    June 20, 2000, to Mr. Nurick, and it's regarding his Genesis

3    investment.

4    A.    Yes.

5    Q.    And then there is information contained in Section 1 as

6    direct rollover to Genesis from IRA; correct?

7    A.    Yes.

8    Q.    And that's the information you were talking about from the

9    pension plans and the 1099s?

10   A.    1099-Rs, yes.

11   Q.    Then the next section is the investment return from

12   Genesis; correct?

13   A.    Yes.

14   Q.    And there is an amount listed there for 1997 of $44,404;

15   correct?

16   A.    Yes.

17   Q.    And in your schedules, you had no information and no dollar

18   amounts for 1997; correct?

19   A.    Correct.

20   Q.    So Mr. Nurick is providing information to Ms. Nguyen that

21   is based on some information he has that the government has not

22   had because it was not introduced at trial; correct?

23   A.    Yes.

24   Q.    So you know that Mr. Nurick had at least some other money

25   that -- where some Genesis money was going or some other bank

1    account; correct?  That's the only logical conclusion?

2    A.    Yes.

3    Q.    Then at the bottom here, would you agree that the amount

4    put in at the beginning should be treated as his basis, and any

5    money he received after $279,000 essentially would be treated as

6    capital gain?

7    A.    Yes.

8    Q.    That's the $275,000?

9    A.    Yes.

10   Q.    If we could bring up Government Exhibit 347.  If we could

11   look at the second page.  Zoom in on the interest income and the

12   investment income.

13           Do you recall Mr. Lam's testimony and Mr. Nurick's

14   testimony that this was information that was typed up by Mr. Lam

15   based on what Mr. Nurick had provided to him?

16   A.    Yes.

17   Q.    And in the investment income, there's long-term investment

18   return from Genesis listed for 1999 and for 2000; correct?

19   A.    Correct.

20   Q.    And those amounts are reported as capital gain on his tax

21   return?

22   A.    Correct.

23   Q.    The interest income for 1999 is listed as $115 from Clovis;

24   is that correct?

25   A.    That's what it shows, yes.

1    Q.   And in the miscellaneous column for 2000, it's only $29?

2    A.   Yes.

3    Q.   You've been here for the entire trial; correct?

4    A.   I have.

5    Q.   Have you reviewed the exhibits that have been admitted into

6    evidence?

7    A.   I have.

8    Q.   And isn't it true that in the Ansbacher bank statements,

9    the account in the name of NG Enterprises, Ltd., that Mr. Nurick

10   had over $4,000 in interest income that was not reported?

11   A.   I don't remember the amount, but the interest in Ansbacher

12   was not reported, yes.

13   Q.   All right.  And that was Mr. Nurick's company?

14   A.   Yes.

15   Q.   If we could pull up Exhibit 403, please.  Counsel went over

16   the schedule a little bit with you; correct?

17   A.   Yes.

18   Q.   And your disagreement with the government's calculations is

19   that the four Luna de Los Crestones amounts should not be

20   considered income to Mr. Nurick; is that correct?

21   A.   Yes.

22   Q.   Because you're saying that Luna de Los Crestones is not his

23   entity?

24   A.   That's my understanding, yes.

25   Q.   And could you tell the jury what exhibit you have that

```
 1   shows that Mr. Nurick sold his interest in Genesis?
 2   A.   Well, I'm aware of some documents.  I don't believe that
 3   they're introduced into evidence in this case.
 4   Q.   Do you have them on the stand with you?  Is it something
 5   you reviewed to form your opinion?
 6   A.   I don't have it on the stand.
 7   Q.   Do you have it here in the Court?
 8   A.   Mr. Lombard may have it.
 9            MR. LOMBARD:  Court's indulgence.
10            THE COURT:  Sure.
11               (Counsel confer off the record)
12   BY MS. HENDRICKSON:
13   Q.   The source of the account for this money is listed in the
14   far right; correct?
15   A.   Yes.
16   Q.   And you do not dispute that the International Centrix
17   Account Trust was used to distribute Genesis funds; correct?
18   A.   Yes.
19   Q.   Yes, you agree, or yes, you dispute it?
20   A.   Yes, I do not disagree.  Sorry.  You asked me a double
21   negative.
22   Q.   I'll rephrase next time.
23        All right.  So our totals agree, it's just the
24   characterization of whether it's Mr. Nurick's income or money
25   that you say was given to Mr. Tinoco; correct?
```

1    A.    Correct.

2    Q.    All right.  If we could look at the Exhibit 5, page 1.  If

3    we could zoom in first on line 13.  And this is the 1999 form

4    1040 for Mr. Nurick.  Do you want us to go out so you can see

5    the whole exhibit?

6    A.    No.  I know what it is.  That's the capital gain on

7    Schedule D.

8    Q.    If we could turn to page 5 of this exhibit for the Schedule

9    D, just zooming in there.  And here it's listed Genesis

10   investment date acquired January 1, 1995; correct?

11   A.    Yes.

12   Q.    It says date sold 12/31/99?

13   A.    Yes.

14   Q.    Sale price is $285,688; is that correct?

15   A.    It says *sales price,* but that's the amount he received that

16   year.

17   Q.    Yes.  And then the next column has no cost or basis;

18   correct?

19   A.    Correct.

20   Q.    So all money was taxable as a long-term capital gain?

21   A.    Yes.

22   Q.    That's also consistent with the testimony of Tony Lam and

23   Lyly Nguyen; correct?

24   A.    Yes.

25   Q.    And with the letter that we just reviewed that said he

1   basically had recouped all of his investment in earlier years so

2   now 1999 and after, it's all going to be taxable income if he

3   gets Genesis distributions; correct?

4   A.    Correct.

5   Q.    If we could pull up Exhibit 404, please.  Now, on this

6   chart for 2000, there's $303,000 total that is attributed to

7   Mr. Nurick.  Do you agree with that?

8   A.    Yes.  Well --

9   Q.    Your only disagreement is with one of the line items;

10  correct?

11  A.    Right.

12  Q.    For December 13 of 2000, the $63,000 payment that came from

13  Harrow Management and went into Luna de Los Crestones at Banco

14  Interfin; correct?

15  A.    Yes.

16  Q.    Your testimony is that that is money that went to

17  Mr. Tinoco, not to Mr. Nurick?

18  A.    Yes.

19  Q.    All right.  If we could look at Exhibit 6, page 1 of the

20  tax return, now the amount here is -- that's reported by

21  Mr. Nurick on his individual tax return for 2000 is $317,114;

22  correct?

23  A.    Yes.

24  Q.    And you would agree that the government could only trace

25  $303,000 to him; correct?

1    A.    Well --

2    Q.    Based on that prior chart?

3    A.    To him and to Tinoco, yes.

4    Q.    And let's go back to the chart, 404.  So Mr. Nurick told

5    the IRS, *I had over $300,000 of capital gains for 2000*; correct?

6    A.    Yes.

7    Q.    And if we take out the amount that you're saying should not

8    be attributed to him, then we would be at an amount of about

9    $240,000; correct?

10   A.    That's correct.

11   Q.    So Mr. Nurick would be admitting he got money in some other

12   account that was a Genesis distribution that was taxable to him,

13   just not this one?

14   A.    Well, we can't account for it because the records are

15   incomplete, but, yes, I mean, he's saying that he got $317,000.

16   You're showing 303 and I'm showing 273.

17   Q.    So you would agree that even including the Luna de Los

18   Crestones amount, the government still didn't come up to what

19   Mr. Nurick reported; correct?

20   A.    Yes.  Correct.

21   Q.    If you take that money out, then that means there is some

22   other account out there where Mr. Nurick has admitted to

23   receiving Genesis distributions that the government could not

24   find?

25   A.    Yes.

```
 1            THE COURT:  Ms. Hendrickson, is this a good time for a
 2   break?
 3            MS. HENDRICKSON:  Yes, your Honor.
 4            THE COURT:  Ladies and gentlemen, don't talk about the
 5   case or form or express any opinions about the case until it's
 6   finally submitted to you.  We will take a 15-minute break.
 7                        (Recess taken)
 8                         (Jury In)
 9            THE COURT:  Everyone is present.  The witness is back
10   on the stand.
11            Sir, you are still under oath.
12            Ms. Hendrickson, you may continue.
13            MS. HENDRICKSON:  Thank you, your Honor.
14   Q.   Could we pull up Exhibit 316, please.
15            Mr. Laffer, this is a copy of a document where
16   Mr. Nurick -- do you see his signature at the bottom?
17   A.   Yes.
18   Q.   And he's signed as trustee for NG Enterprises; correct?
19   A.   Yes.
20   Q.   Is requesting that $60,000 be transferred from the account
21   of NG Enterprises at Ansbacher Jersey and transferred to an
22   account in the name of Luna de Los Crestones at Banco Interfin;
23   correct?
24   A.   Yes.
25   Q.   And wouldn't you agree that if somebody was transferring
```

1    money to a bank account, especially $60,000, that that would be

2    an account they would control?

3    A.    I wouldn't -- I wouldn't conclude that at all.

4    Q.    Let's go to the next exhibit, 157, page 2.  And in fact the

5    bank statement that's in evidence for NG Enterprises, Ltd.,

6    reflects a transfer of $60,000 on May 18, 1999; correct?

7    A.    Yes.

8    Q.    How many years did you work as a special agent?

9    A.    I was a special agent and group manager for nine years.

10   Q.    And as part of your training in how to prove fraud, would

11   you agree that one of the best indications of someone's intent

12   is whether they have control over the money?

13   A.    Well, I mean, intent is a nebulous term that could relate

14   to anything, but when you say *control over the money*, I'm not

15   sure what you mean.

16   Q.    All right.  Let me ask you, in your experience as a special

17   agent and in private practice for the last 20 years, are you

18   familiar with the term *nominee*?

19   A.    Sure.

20   Q.    And would you agree that a nominee is someone who owns

21   something on paper but in fact someone else is actually

22   controlling what's going on with that account or with that

23   asset?

24   A.    Yes.

25   Q.    And one of the ways that you as a special agent, when you

1  were investigating tax fraud, would prove willfulness is through

2  tracing money and seeing where it went and who controlled the

3  spending; correct?

4  A.  Yes.

5  Q.  If we could go to Exhibit 7, page 1.  Now, in 2001, if we

6  could look down at the bottom on line 21, Mr. Nurick reports on

7  his individual 1040 $11,646 from Aztec Irrevocable Trust;

8  correct?

9  A.  Yes.

10  Q.  You agree that was money that was distributed from Genesis?

11  A.  Yes.  I believe it went to his wife Eleanor.

12  Q.  When you were working as a special agent and now when you

13  are working in private practice, were you familiar with people

14  using the state of Nevada to create businesses?

15  A.  Yeah.  People do that all the time.

16  Q.  Well, isn't it true that one of the reasons they use the

17  state of Nevada is because the state does not require a public

18  listing of the officers or who controls the company?

19  A.  You know what?  I'm not aware of that.  Most people do it

20  because they think Nevada is a tax-free state.  I don't know if

21  Nevada reports officers or not.  I don't know.

22  Q.  Okay.  You're not familiar with that?

23  A.  No, I'm not.

24  Q.  But you are familiar that one of the deeds for Mr. Nurick's

25  Shaver Lake cabin was in the name of Shaver Lake, Ltd., Property

Partnership?

A.    Yes.  I saw that in court.

Q.    If we could bring up Exhibit 151, page 1.  Do you recall
the testimony about this check, which was a payment to Mr. Biber
regarding the second deed of trust that he gave to Mr. Nurick,
the $140,000?

A.    Yes.  That was the interest payment.

Q.    And this was paid just one month after the promissory note
in January of 2001; correct?

A.    Yes.

Q.    And is it your understanding that if an individual pays
interest, then the individual can deduct the interest on their
1040; correct?

A.    Yes.

Q.    If a partnership pays the interest, then the deduction
should be on the partnership return; correct?

A.    Yes.

Q.    Did you notice that on Mr. Nurick's tax return, that he
deducted this $9,800 as a deduction on his personal tax return?

A.    I don't remember, but I'm not going to disagree with you.

Q.    Can we pull up Exhibit 405, please.  So I think we agreed
that the first item, the $11,666, that that's what Mr. Nurick
reported as income on his 2001 return; correct?

A.    Yes.  It's the same amount.

Q.    And all of these amounts from Luna de Los Crestones he

1  received April, May, June, July -- none of those were reported;

2  correct?

3  A.    Correct.

4  Q.    And would you agree that Luna de Los Crestones, the Banco

5  Interfin account ending in 2103, is also the same place where

6  money Mr. Nurick received from Genesis was deposited in 1999 and

7  2000?  Would you like me to bring up --

8  A.    Wait.  I'm sorry.  Can you say that one more time?

9  Q.    Sure.  Would you agree that Luna de Los Crestones, this

10  particular bank account at Banco Interfin, that is listed as the

11  account receiving funds.  Do you see that?

12  A.    Yes.

13  Q.    Do you recall that that's the same account that also

14  received funds in 1999 and 2000?  We can bring up those

15  schedules.

16  A.    Yes.  I'm sorry.  I'm looking at my chart.  Interfin did

17  receive funds in '99 and 2000, yes.

18  Q.    Let's bring up 403 so the jury can follow along, too.

19          So this is the amount that the government traced to

20  Mr. Nurick of Genesis funds received, and in fact Mr. Nurick

21  reported about $20,000 more on his 1999 income tax return;

22  correct?

23  A.    Yes.

24  Q.    And if we can bring up the next exhibit, 404, for 2000.

25  The government traced $303,000 to Mr. Nurick, but Mr. Nurick

1   reported $317,000; is that correct?

2   A.   Yes.  But when you say traced to Mr. Nurick, again I take

3   exception to the disbursements to Luna for this chart 404 and

4   403.  You said to Nurick.  It's to Nurick and to Luna de Los

5   Crestones.

6   Q.   Yes.  I understand your distinction.

7   A.   Okay.

8   Q.   Now, if we can go back to 405, 2000.  Now, when you were a

9   special agent and you were investigating tax fraud, wouldn't one

10   of the key things you do in analyzing bank accounts is to try to

11   see some kind of pattern over a period of years?

12   A.   Yes.

13   Q.   And you would agree, even if you don't agree with the final

14   characterization, that Mr. Nurick received money from Genesis

15   that was put into the Luna de Los Crestones account in

16   Costa Rica in '99, 2000, and 2001; correct?

17   A.   Yes.

18   Q.   If we could pull up Exhibit 7, page 1.  Focusing on line 21

19   now, for this year, Mr. Nurick only reported the 11,000, and his

20   total income on line 22 there is $28,385; correct?

21   A.   Yes.  Total income, correct.

22   Q.   Based on the government's chart, he received over $230,000;

23   correct?

24   A.   If you include the Luna de Los Crestones receipts,

25   that's -- yes.

Q.    Yes.  And would you agree -- let me ask you about one question on your direct testimony.  You said that this was improperly characterized as ordinary income and should have been capital gain; is that correct?

A.    Yes.

Q.    Would you also agree that the tax that was paid on this $11,000 at an ordinary tax rate is significantly less than the capital gain rate would have been if Mr. Nurick reported all of the money he received, including from Luna de Los Crestones, which was $230,000?

A.    Total tax would have been greater, yes.

Q.    You made -- you were asked some questions about the statute of limitations regarding filing of an amended return.  Do you recall that?

A.    Yes, I do.

Q.    Now, isn't it true that if the understatement is more than 25 percent, that the statute is then extended to six years?

A.    Yes.

Q.    Which would have been within the time frame when Mr. Nurick's 1995 amended tax return was filed?

A.    But he didn't underreport his income by 25 percent.

Q.    Based on the return he filed with the IRS in May of 2000, he had underreported more than 25 percent of his income, based on what he filed with the IRS; correct?

A.    No.

1    Q.    In your schedule you also had something about -- if we can

2    pull it up here.  All right.

3          Now, the payments to Tinoco, that's just based on your

4    understanding of what Mr. Nurick said to you; right?  And

5    testified at trial here before the jury?  The fact that money

6    was paid to Tinoco and not to Mr. Nurick?

7    A.    Yes.  Well, it went to the Luna account.

8    Q.    Yes.  But as an expert with all the records that had been

9    introduced, all the bank accounts, all the other documents we

10   have seen from Costa Rica and the Bahamas, Asia Pacific, Wing

11   Hang Bank, there are no documents in evidence before this jury

12   that show Mr. Nurick sold his interest in Genesis to Mr. Tinoco;

13   correct?

14   A.    Well, if you look at the tax return for the 1999 year, it

15   shows that he sold his interest in Genesis, 12/31/99.  So in

16   '99 --

17   Q.    Sir, let me just ask you the question.  Is there a document

18   in evidence that reflects Mr. Nurick sold his interest in

19   Genesis?  Not what he reported on his tax returns, because I

20   think it's -- we could draw different conclusions as we have --

21          THE COURT:  Just ask a question.

22          MS. HENDRICKSON:  All right.

23   Q.    Is there a document, a sales agreement, a contract, in

24   evidence before this jury regarding Mr. Nurick's sale of his

25   interest in Genesis?

```
 1    A.    No.
 2    Q.    Now, you also mentioned there's an account here for 2001
 3    and 2002 that's regarding Belize.  Do you see that?
 4    A.    Yes.
 5    Q.    And based on your review of the evidence, Mr. Nurick in
 6    fact opened a bank account at Provident Bank & Trust in Belize;
 7    correct?
 8    A.    You know what?  I don't recall that.  I -- I'm not
 9    disagreeing with you, but I don't recall.
10    Q.    Well, when you included this on your schedule, you reviewed
11    some documents regarding this; correct?
12    A.    Well, there was an account in the name of Luna de Los
13    Crestones in Belize.
14    Q.    Yes.
15    A.    And that's what this 48 -- I'm sorry.  This 48 -- this
16    $48,425 and the $47,000 was deposited to the Belize account in
17    the name of Luna de Los Crestones.
18    Q.    And are you aware that Mr. Nurick himself went to Belize to
19    open that bank account in the name of Luna de Los Crestones?
20    A.    I'm not aware of that.
21    Q.    If we could bring up Exhibit 100, please.  This is a
22    signature card for I-Control NB Account Trust for account 5757.
23    Do you see that?
24    A.    Yes.
25    Q.    And Mr. Nurick is the signer on this account?
```

1    A.    Yes.

2    Q.    And in the upper left here, it says it's a checking

3    account; correct?

4    A.    Yes.  Yes.

5    Q.    And if we could go to page 2.  And this part says that it's

6    an individual account; correct?

7    A.    Yes.

8    Q.    So there's nothing in the records regarding this bank

9    account that says it's any kind of trust or retirement account;

10   correct?

11   A.    Correct.

12   Q.    If we could pull up Exhibit 352, please.  Do you recall

13   this check being introduced into evidence, a check payable to

14   Royal Buick drawn on the account of I-Control NB Account Trust?

15   A.    Yes.

16   Q.    And the check is dated April 19 of 1999 for $33,949?

17   A.    Yes.

18   Q.    And this was a check that Mr. Nurick used to buy a 1999 GMC

19   truck which he titled in the name of Sierra Truck Holding Trust;

20   is that correct?

21   A.    Yes.

22   Q.    Would you agree that there is nothing consistent with the

23   use of this money in the way the car was titled to show

24   I-Control NB Account Trust as any kind of retirement account?

25   A.    Yeah.  There's no designation on the check, yes.

1    Q.    And buying a car is not a typical investment by a

2    retirement fund; correct?

3    A.    Well, no.  I mean, this -- in my opinion, this should have

4    been taxed to him at the time he took the money out because at

5    that point, it would have been taxable income.

6    Q.    When you were investigating cases when you were still

7    working for the government -- I want to direct your attention to

8    one case where you had prepared some tax returns for a person

9    named -- and you can please correct the pronunciation for me,

10   but it's spelled S-C-H-O-C-H.  Schoch?  Do you remember that?

11   A.    Oh, Eric Schoch.

12   Q.    Yes.

13   A.    That was like 25 years ago.

14   Q.    I believe it was 1987 and 1986, you prepared amended tax

15   returns for Mr. Schoch regarding some sales of coins that he had

16   over a period of time; is that correct?

17   A.    Platinum coins.

18   Q.    And the records that you had prepared and the tax returns

19   you prepared showed that he had -- after you took away the

20   basis, his gain was only $72,000, approximately?  I don't know

21   if you remember exactly.  The total sales was around

22   1.9 million, the basis was around 1.8 million, and so the gain

23   was relatively modest at 72,000.

24              MR. LOMBARD:  Object to relevance.

25              THE COURT:  Ms. Hendrickson, is there some relevance

1    to this?

2         MS. HENDRICKSON:  Yes.

3    Q.   In deciding the basis in this case and how you accounted

4    for Genesis, if Luna de Los Crestones is Mr. Nurick's account

5    and he has full control over that, then you would agree any

6    money he receives 2000, 2001, 2002, would be fully taxable to

7    him; correct?

8    A.   Yes.

9    Q.   And would you agree that when people create offshore bank

10   accounts, that in your experience as a special agent and in

11   private practice, that one of the reasons they do that is it's

12   harder for the government to get records of the money that they

13   put in and put out; correct?

14   A.   Well, I think today there's no question that Swiss bank

15   accounts or any foreign bank accounts are fair game for the --

16   for the U.S. government.  There's free exchange of account

17   information.

18   Q.   But back in 2000 and 2001, that was not the case, was it?

19   A.   Well -- but there were other reasons for setting up

20   accounts.

21   Q.   I'm just asking if that was one reason, based on your

22   experience?

23   A.   Could have been, yes.

24        MS. HENDRICKSON:  Brief moment, your Honor?

25        THE COURT:  Yes.

```
1              (Government counsel confer off the record)
2          MS. HENDRICKSON:  No further questions, your Honor.
3          THE COURT:  Mr. Lombard?
4          MR. LOMBARD:  Briefly, your Honor.
5                       REDIRECT EXAMINATION
6  BY MR. LOMBARD:
7  Q.   Mr. Laffer, could you explain what are the other reasons an
8  individual would open accounts offshore?
9  A.   A lot of times people use -- or still use offshore accounts
10 for asset protection.  For example, if somebody is in a position
11 where creditors can go after them or if there is judgments
12 rendered against them, it's more difficult -- I don't know if
13 it's impossible, but more difficult for judgments to be executed
14 on foreign accounts.
15 Q.   Now, you were asked a question on direct regarding money
16 being sent, a request to be sent by Mr. Nurick to Luna de Los
17 Crestones, and the government counsel asked you would you say
18 that that's his account because money was sent to the account at
19 Luna de Los Crestones.  And you answered no.  Do you recall that
20 question and answer?
21 A.   I do.
22 Q.   Why would you say no, that person doesn't necessarily own
23 the account?
24 A.   Well, I've been involved in international transactions
25 where I wire transferred funds to a foreign account, and that
```

```
 1   didn't mean that I owned that account.  I was buying something,

 2   and in this specific case, my understanding is that Mr. Nurick

 3   had a credit card from Luna de Los Crestones, and, again, I

 4   understand from talking to Mr. Nurick that that 60,000 was used

 5   to reimburse Luna from some charges that were on the credit card

 6   so that's why I answered it that way.

 7   Q.   You were asked a question about the state of Nevada and

 8   your experience with individuals who opened accounts in the

 9   state or corporations in the state of Nevada.  What's your

10   experience with people who you have worked for and reviewed

11   their corporate documents regarding why they opened a

12   corporation in the state of sentence?

13               MS. HENDRICKSON:  Objection.  Relevance.

14               THE COURT:  I'll allow a brief answer, if it's not too

15   long.

16               THE WITNESS:  Most people know that or believe that

17   Nevada corporations are not subject to tax, and so they open up

18   Nevada corporations, but if the business is in California, then

19   it's -- then all of the income is taxable in California, and

20   there is no benefit to a Nevada corporation.

21   BY MR. LOMBARD:

22   Q.   You were asked a follow-up question to that regarding

23   Shaver Lake Limited Partnership?

24   A.   Yes.

25   Q.   Do you know who set up -- based on your review of the
```

1    documents and listening to the testimony, do you know who set up

2    the Shaver Lake Limited Partnership?

3    A.    My understanding is it was Lashlee.

4    Q.    And you were asked some questions about your experience as

5    a tax fraud examiner regarding tracing accounts and the pattern

6    of money that was -- the way the money flowed in this case.

7    Based on your experience and your review of the documents as a

8    tax fraud examiner, do you see any evidence that would lead you

9    to believe that there is fraud in this case?

10   A.    No.  I -- it's -- I mean, are you talking about the 433-A

11   and -- and all of the banking transactions?  The answer is no.

12             MR. LOMBARD:  Thank you.  No further questions.

13             THE COURT:  Ms. Hendrickson.

14             MS. HENDRICKSON:  Briefly, your Honor.

15                        RECROSS-EXAMINATION

16   BY MS. HENDRICKSON:

17   Q.    If we could pull up Exhibit 188.  This is a document

18   drafted December of 1999.  If we could show that date first so

19   he could see that.  The upper right.

20   A.    Yes.

21   Q.    This is a document that has been translated into English

22   and is on Andres Tinoco's letterhead and is dated December 20,

23   1999; is that correct?

24   A.    Yes.

25   Q.    It's to a Mr. Antonio Ramirez at Banco Interfin?

A.    Yes.   That's what it says.

Q.    If we could go down to the specifics, there is a request being made for two transfers.   The first one is $2,000 to the credit of the account Flowers, Cabinet & Fixtures for $2,000; is that correct?

A.    Yes.

Q.    Do you recall Mr. Nurick's testimony that Flowers, Cabinets & Fixtures made tables and cabinets for his cabin in Fresno, California?

A.    Yes.

Q.    So you would agree that he's directing how this money gets spent; correct?

A.    Well, Mr. Tinoco is directing the disbursement.   I'm assuming that it was Mr. Nurick's request to Mr. Tinoco to disburse the funds there.

Q.    Well, based on where the money went and Mr. Nurick's testimony, that's the only logical conclusion; correct?   That he asked Mr. Tinoco to send him this money?

A.    Yes.

Q.    And the second amount is $10,500, and it gets sent to the Nurick Associates bank account at Wells Fargo, and that's also a bank account that Mr. Nurick controls; correct?

A.    Yes.

        MS. HENDRICKSON:   No further questions.

        THE COURT:   Mr. Lombard?

1          MR. LOMBARD:  Just one.

2                    REDIRECT EXAMINATION

3   BY MR. LOMBARD:

4   Q.   Mr. Laffer, do you know whose decision it was to send money

5   to Cabinet Fixtures from Luna de Los Crestones?

6   A.   I assume it was Mr. Nurick's request to Tinoco to send the

7   money.

8   Q.   Whose decision was it to use Luna de Los Crestones as the

9   account of origin for payment?

10          MS. HENDRICKSON:  Objection.  Calls for speculation.

11  BY MR. LOMBARD:

12  Q.   If you know.

13          THE COURT:  Well, you have to lay some foundation for

14  how he would know first.

15  BY MR. LOMBARD:

16  Q.   Mr. Laffer, you indicated that the document that the

17  government just showed you you assumed was Mr. Nurick's request

18  to Mr. Tinoco to pay the cabinet fixture company; right?

19  A.   Yes.

20  Q.   Do you know whether or not Mr. Nurick requested what

21  account Mr. Tinoco was to use to pay the cabinet fixtures?

22          MS. HENDRICKSON:  Objection.  Assumes facts not in

23  evidence.

24          THE COURT:  I'll allow you to answer it.

25          THE WITNESS:  I would have no way of knowing that.

```
 1              MR. LOMBARD:  No further questions.

 2              THE COURT:  Ms. Hendrickson?

 3              MS. HENDRICKSON:  No further questions, your Honor.

 4              THE COURT:  Thank you, sir.  You can step down.

 5              THE WITNESS:  Thank you, Judge.

 6              THE COURT:  Do you have any further witnesses,

 7  Mr. Lombard?

 8              MR. LOMBARD:  No, your Honor.

 9              THE COURT:  Does the government have any rebuttal?

10              MS. HENDRICKSON:  No, your Honor.

11              THE COURT:  Are we ready for jury instructions?

12              MR. LOMBARD:  I would, your Honor -- I would reserve

13  the right to make an argument at sidebar at some point.

14              THE COURT:  Okay.  Is that all right with you,

15  Ms. Hendrickson?

16              MS. HENDRICKSON:  Yes, your Honor.

17              THE COURT:  Thank you.  All right.

18              Ladies and gentlemen, you have heard all the evidence.

19              MS. HENDRICKSON:  Your Honor --

20              MR. KLUGE:  One other issue, and that was the

21  stipulation that we were going --

22              THE COURT:  I'm sorry.  Yes.  Do you want to do that

23  first?

24              MR. KLUGE:  *The Genesis Fund, also known as The Human*

25  *Element, abbreviated T.H.E., was an investment fund which*
```

1   *operated from approximately 1994 through 2002.  Genesis Fund*

2   *literature described foreign currency trading as the principal*

3   *activity of the fund.  Distributions were made from the Genesis*

4   *Fund during the time period 1994 through 2002.*

5   *At the time the distributions were made, they were not*

6   *intended to be gifts, loans, or notes which were required to be*

7   *paid back by the recipient.*

8   THE COURT:  All right.  As I said, you've heard all

9   the evidence, and it's now my duty to instruct you on the law

10  that applies to the case.  Copies of these instructions will be

11  available in the jury room for you to consult.  It is your duty

12  to weigh and to evaluate all the evidence received in the case,

13  and in that process, to decide the facts.  It is also your duty

14  to apply the law, as I give it to you, to the facts, as you find

15  them, whether you agree with the law or not.

16  You must decide the case solely on the evidence and

17  the law and must not be influenced by any personal likes or

18  dislikes, opinions, prejudices or sympathy.  You will recall

19  that you took an oath promising to do so at the beginning of the

20  case.

21  You must follow all these instructions and not single

22  out some and ignore others.  They are all important.  Please do

23  not read into these instructions or into anything I may have

24  said or done any suggestion as to what verdict you should

25  return.  That is a matter entirely up to you.

1    The indictment is not evidence.  The defendant has

2  pleaded not guilty to the charge.  The defendant is presumed to

3  be innocent unless and until the government proves the defendant

4  guilty beyond a reasonable doubt.

5    In addition, the government has the burden of proving

6  every element of the charge beyond a reasonable doubt.

7    The defendant has testified.  You should treat this

8  testimony just as you would the testimony of any other witness.

9    Proof beyond a reasonable doubt is proof that leaves

10  you firmly convinced the defendant is guilty.  It is not

11  required that the government prove guilt beyond all possible

12  doubt.  A reasonable doubt is a doubt based on reason and common

13  sense and is not based purely on speculation.  It may arise from

14  a careful and impartial consideration of all the evidence or

15  from lack of evidence.  If, after a careful and impartial

16  consideration of all the evidence, you are not convinced beyond

17  a reasonable doubt that the defendant is guilty, it is your duty

18  to find the defendant not guilty.

19    On the other hand, if, after a careful and impartial

20  consideration of all the evidence, you are convinced beyond a

21  reasonable doubt that the defendant is guilty, is your duty to

22  find the defendant guilty.

23    The evidence you are to consider in deciding what the

24  facts are consists of the sworn testimony of any witness, the

25  exhibits received in evidence, and any facts to which the

1  parties have agreed.

2        In reaching your verdict, you may consider only the

3  testimony and exhibits received in evidence.  The following

4  things are not evidence, and you may not consider them in

5  deciding what the facts are:

6        One, questions, statements, objections, and arguments

7  by the lawyers are not evidence.  The lawyers are not witnesses.

8  Although you must consider a lawyer's questions to understand

9  the answers of a witness, the lawyer's questions are not

10 evidence.  Similarly, what the lawyers have said in their

11 opening statements, will say in their closing arguments and at

12 other times is intended to help you interpret the evidence, but

13 it is not evidence.  If the facts, as you remember them, differ

14 from the way the lawyers state them, your memory of them

15 controls.

16       Two, any testimony that I have excluded, stricken or

17 instructed you to disregard is not evidence.  I can't remember

18 whether there was any testimony -- okay.

19       Three, anything you may have seen or heard when the

20 Court was not in session is not evidence.  You are to decide the

21 case solely on the evidence received at the trial.

22       Evidence may be direct or circumstantial.  Direct

23 evidence is direct proof of a fact such as testimony by a

24 witness about what that witness personally saw or heard or did.

25 Circumstantial evidence is indirect evidence; that is, it is

1  proof of one or more facts from which you could find another

2  fact.

3          You are to consider both direct and circumstantial

4  evidence.  Either can be used to prove any fact.  The law makes

5  no distinction between the weight to be given to either direct

6  or circumstantial evidence.  It is for you to decide how much

7  weight to give to any evidence.

8          In deciding the facts in this case, you may have to

9  decide which testimony to believe and which testimony not to

10 believe.  You may believe everything a witness says or part of

11 it or none of it.  In considering the testimony of any witness,

12 you may take into account, one, the witness's opportunity and

13 ability to see or hear or know the things testified to; two, the

14 witness's memory; three, the witness's manner while testifying;

15 four, the witness's interest in the outcome of the case, if any;

16 five, the witness's bias or prejudice, if any; six, whether

17 other evidence contradicted the witness's testimony; seven, the

18 reasonableness of the witness's testimony in light of all the

19 evidence; and, eight, any other factors that bear on

20 believability.

21         The weight of the evidence as to a fact does not

22 necessarily depend on the number of witnesses who testify.  What

23 is important is how believable the witnesses were and how much

24 weight you think their testimony deserves.

25         You are here only to determine whether the defendant

is guilty or not guilty of the charge in the Indictment.  The
defendant is not on trial for any conduct or offense not charged
in the Indictment.

Some evidence in this trial consisted of documents
written in Spanish that have been subsequently translated into
English.  For those documents, the evidence you are to consider
and on which you must base your decision is only the English
language translation provided to you.  Although some of you may
know the non-English language used, you must disregard any
meaning of the non-English words that differs from the official
translation.  You may consult the Spanish version of the exhibit
to view these signatures on the documents.

You have heard testimony that the defendant made
certain statements.  It is for you to decide, one, whether the
defendant made the statements, and, two, if so, how much weight
to give to them.  In making those decisions, you should consider
all the evidence about the statements, including the
circumstances under which the defendant may have made them.

You have heard testimony from persons who, because of
education or experience, were permitted to state opinions and
the reasons for their opinions.  Such opinion testimony should
be judged like any other testimony.  You may accept it or reject
it and give it as much weight as you think it deserves
considering the witness's education and experience, the reasons
given for the opinion, and all the other evidence in the case.

1    Certain charts and summaries have been admitted in

2    evidence.  Charts and summaries are only as good as the

3    underlying supporting material.  You should therefore give them

4    only such weight as you think the underlying material deserves.

5    The parties have agreed to certain facts that have

6    been stated to you.  You should therefore treat these facts as

7    having been proved.

8    The defendant is charged in the Indictment with

9    evasion of payment of income tax in violation of Section 7201 of

10   Title 26 of the United States Code.  In order for the defendant

11   to be found guilty of that charge, the government must prove

12   each of the following elements beyond a reasonable doubt:

13   First, the defendant owed federal income tax for

14   calendar year 1995; second, the defendant made an affirmative

15   attempt to evade the payment of such tax; and, third, in

16   attempting to evade the payment of such tax, the defendant acted

17   willfully.

18   An affirmative act to evade payment of income tax may

19   include concealing assets or covering up sources of income,

20   handling one's affairs to avoid making records usual in

21   transactions of the kind, placing assets in the name of other

22   individuals or entities, using bank accounts and conducting bank

23   transactions in the names of other individuals or entities,

24   filing of a false Offer in Compromise with the Internal Revenue

25   Service, transacting business in cash or cashier's checks, and

1    any other conduct, the likely effect of which would be to

2    mislead.

3              An affirmative act must be a commission rather than an

4    omission.  A person may not be convicted of tax evasion on the

5    basis of willful omissions alone.  A person must also undertake

6    an affirmative act of evasion.

7              The government has charged the defendant with multiple

8    affirmative acts.  You must all agree on the affirmative act the

9    defendant committed.  The affirmative acts charged by the

10   government are, one, creating and using Luna de Los Crestones

11   SA, a Costa Rican corporation and a bank account in the same

12   name at Banco Interfin, Costa Rica, from at least on or about

13   May 18, 1999 until at least on or about July 23, 2001.

14             Two, using account number ending in 7304 in the name

15   of NG Enterprises, Ltd., at Ansbacher Jersey, Ltd., into which

16   deposits from International Centrix Wells Fargo Bank, Laguna

17   Beach, California, were made and causing the balance of the

18   account, $133,560.98 to be transferred on or about January 3,

19   2001 to an account ending in 9322 at Ansbacher Jersey, Ltd.,

20   belonging to John Biber.

21             Three, withdrawing the equity on his residence by

22   obtaining a $140,000 mortgage from John Biber's company on or

23   about February 2, 2001, and using the funds for his personal

24   benefit rather than paying the IRS.

25             Four, signing on or about April 19, 2001, and filing

with the IRS on or about May 16, 2001 a joint Offer in Compromise Form 656 that was materially false and fraudulent in that defendant falsely claimed in Item 6 that there was doubt as to collectability of the tax liability of 1995 because he had, quotes, *insufficient assets and income to pay the full amount* when, as he well knew, he had sufficient income and assets to pay the full amount.

And five, signing on or about April 19, 2001, and filing with the IRS on or about May 16, 2001, a joint Offer in Compromise Form 656 that was materially false and fraudulent in that defendant omitted therefrom information about the following assets:  One, a 1999 GMC pickup truck; two, Aztec Irrevocable Trust bank account ending in 091-2 at Downey Savings & Loan, Newport Beach, California; and three, the bank accounts in the name of Luna de Los Crestones SA at Banco Interfin Costa Rica.

You must all agree beyond a reasonable doubt that the defendant committed at least one affirmative act to evade the payment of income tax, with all of you agreeing on the same act.

In order to prove that the defendant acted willfully, the government must prove beyond a reasonable doubt that the defendant knew federal tax law imposed a duty on him, and the defendant intentionally and voluntarily violated that duty.  The government must prove beyond a reasonable doubt that the defendant had the unlawful intent to evade the payment of his income taxes.  Evidence that the defendant in good faith

1    followed the advice of counsel would be inconsistent with such

2    an unlawful intent.  Unlawful intent has not been proved if the

3    defendant, before acting, made full disclosure of all material

4    acts to an attorney, received the attorney's advice as to the

5    specific course of conduct that was followed, and reasonably

6    relied on that advice in good faith.

7             All right.  It's time for the government's closing

8    argument.  And I remind you again that what the attorneys say

9    during argument is not evidence.  Each attorney will outline for

10   you his or her interpretation of what the evidence shows.  If

11   the attorneys state the evidence to you differently from your

12   recollection of the evidence, you should rely on your own

13   recollection of the evidence.  And if the attorneys discuss the

14   law and it's different from my instructions on the law, you must

15   rely on the law as I have stated it to you.

16            First, as I said, the government will give an opening

17   argument; then the defendant will give an opening argument; and

18   then the government will give a closing argument.

19            Just keep an eye on the clock, Ms. Hendrickson, or

20   I'll remind you that we would like to take a break around 10:45,

21   whenever is a convenient time if you're not done by then.

22            MS. HENDRICKSON:  Thank you, your Honor.

23                  *Government's Opening Argument*

24            MS. HENDRICKSON:  Counsel, the Court, ladies and

25   gentlemen of the jury, we've thrown a lot of information at you

1    in a very short period of time.  When you have a chance to look

2    at the evidence, you will see that the government has proved

3    that Mr. Nurick acted intentionally to evade the payment of his

4    1995 income taxes.

5            In opening, counsel told you that we would take you on

6    a global tour of tax evasion, and with the records and the

7    testimony, indeed we have.

8            First we started in California, where Mr. Nurick lived

9    and also where Ms. Teresa Vogt lived and operated as the

10   administrator of the Genesis Fund.  The Bahamas was used by

11   Mr. Nurick to incorporate NG Enterprises, Inc.  Costa Rica was

12   where Mr. Nurick had a bank account in the name of Luna de Los

13   Crestones and was also where Genesis Fund was run for a period

14   of time, based on Teresa Vogt's testimony, and Mr. Tinoco

15   assisted in issuing the distribution checks for the Genesis

16   Fund.

17           The Isle of Jersey is relevant to this case because

18   Mr. Nurick had a bank account there in the name of

19   NG Enterprises, Inc.  And then finally go over to Hong Kong

20   where there were a few wire transfers from Asia Pacific, which

21   you will see in the records, and those also were distributions

22   of funds from the Genesis Fund.

23           If we could pull up Exhibit 9.  There is no dispute

24   that Mr. Nurick filed a 1995 amended income tax return that

25   showed he owed on line 20, $106,452.  You can see the stamp from

 1    the IRS is May of 2000.  You can see Mr. Nurick's signature and

 2    Tony Lam's signature is in May of 2000.

 3            When we review the evidence with you, you will see

 4    there is no question that Mr. Nurick had the ability, had the

 5    assets to pay this tax liability in full the day he mailed this

 6    amended tax return.  When he mailed it, he didn't send in any

 7    payments.

 8            Now, during the course of this trial, we've mentioned

 9    several different entities that Mr. Nurick has used to hold

10    titles to property or to use for the names on bank accounts.

11    The key ones I want you to focus on are the ones that were used

12    primarily in 2000 and 2001, and that would be between the filing

13    of this amended return in May of 2000 and the filing of the

14    Offer in Compromise with the IRS in April of 2001.

15            During that time frame, you will see the evidence

16    shows that Mr. Nurick used nine different nominees to control

17    money:  I-Control NB Trust; Luna de Los Crestones;

18    NG Enterprises; Nurick & Associates, Inc.; Nurick Associates

19    Trust; Aztec Irrevocable Trust; Sierra Truck Holding Trust;

20    Shaver Property Trust; Shaver Lake Limited Partnership.

21            When you consider all of this evidence, the most

22    important asset you can take back with you to the jury room is

23    your common sense.  When you look at these transactions, you

24    don't have to be an expert in tax law or offshore banking.  Look

25    at these transactions and say does this make sense from a

1    business purpose or from a financial purpose, or the main point

2    of some of these transactions, to create a trail that makes it

3    very difficult for the IRS to follow or makes it impossible to

4    be able to trace a certain company, such as Luna de Los

5    Crestones, to Mr. Nurick.  We're going to go through some of the

6    evidence with you to show his control of the money over a long

7    period of time, the testimony of Teresa Vogt and Denise

8    Taylor-Fraser.  Mr. Nurick was Luna de Los Crestones; that was

9    his corporation, that was his money that was received.

10         This case is about choices.  Mr. Nurick had a choice.

11   He could pay the $106,000 right away when he filed the amended

12   return or he could take deliberate intentional acts to commit

13   fraud.  We are sitting here today because Mr. Nurick made that

14   second choice.

15         Mr. Nurick testified that he is an engineer.

16   Engineers are analytical, precise, and very detail oriented.

17   Mr. Nurick also testified that he had a plan.  The government

18   submits to you he did have a plan, and that plan was to evade

19   his income taxes for 1995.

20         Recall Tony Lam's testimony, his CPA who prepared a

21   lot of the tax returns.  He had Mr. Nurick sign a piece of paper

22   that Mr. Lam had typed up to say, *Make sure that I got this*

23   *right.  Here's all the information you gave me for your 1999*

24   *return and your 2001.*  Mr. Nurick signed it.  That will be in

25   Exhibit 347 for you to review.

Mr. Lam testified that Mr. Nurick never told him about the Ansbacher account in Jersey in the name of NG Enterprises. Mr. Lam testified he did not know about the Luna de Los Crestones account, Banco Interfin, in Costa Rica.

Similarly, Lyly Nguyen said, *Mr. Nurick never told me about the Ansbacher account, NG Enterprises.  Mr. Nurick never told me about the Luna de Los Crestones account.  If he had told me about those accounts and his control of that money, I would have put it on the form that we submitted to the IRS.*  She repeatedly said that.

Mr. Nurick also never filed any foreign bank account reports.  Recall Revenue Agent Jean Pugh's testimony that if you have a balance of over $10,000 during any time of the year, you're required to file that form with the government.  When you look through the schedules of the money that Mr. Nurick received, you will see many of the transactions were over $10,000.  So there was no question he had a duty to file those forms for 1999, for Ansbacher and for Luna de Los Crestones; for 2000 for Ansbacher and Luna de Los Crestones; for 2001 for Ansbacher and Luna de Los Crestones.

His actions are entirely consistent.  He did not tell Tony Lam about the accounts, he did not tell Lyly Nguyen about the accounts, and he did not tell the government about the accounts because he didn't want the government to know he had that much money sitting offshore because if he did, the

1    government was not going to take anything less than a hundred

2    percent to pay that balance in 1995.

3            One of the things that was on the list of items that

4    Mr. Nurick gave to Mr. Lam was interest income.  For 2000, it

5    shows $29.  On his tax return for the year 2000 on line 8-A

6    where it reports interest income, it's $29.  In fact, Mr. Nurick

7    had significantly more interest income than that.

8            You have in evidence copies of these statements.  We

9    have taken just the line item from each of these quarterly

10   statements.  You can see in the upper right here, it says

11   NG Enterprises, Ltd.  This is the account at Ansbacher.  For the

12   first quarter, March 2000, interest is over $600; second

13   quarter, $1,200; third quarter, $1,300; fourth quarter, $1,300.

14           There is the total at the bottom on that previous

15   page.  All right.  Looking up here at the top, we have the

16   amount written up here.  If you take all of those numbers and

17   total them, Mr. Nurick had more than $4,400 in interest income,

18   just from that Ansbacher account, NG Enterprises.  He did not

19   disclose that because he did not tell Tony Lam about that

20   account.

21           If we could go to Exhibit 411, please.  This is a fax

22   letterhead that says Nurick & Associates, and you can't see the

23   last part of Mr. Nurick's name.  It's dated December 6, 2000.

24   The subject line is *1995 tax assessment*, *to Lyly Nguyen from*

25   *Bill Nurick.  Lyly, well, here it is.  We still have 1997 to go.*

*Let me know how we are going to proceed.  As you know, I do not*
*have this much money to cover this year, let alone 1997.*  And
there is one more sentence.

The same time Mr. Nurick is writing this letter to
Ms. Nguyen, he knows he has $133,000 sitting in the Ansbacher
account.  He also knows the IRS just sent him a letter saying *we*
*want you to pay based on the amended return you filed.*

If we could bring up Exhibit 409, please.  Now, this
is a chart of balances in Mr. Nurick's bank account as of
April 19, 2001.  The significance of that date is that it's when
he signed the Offer in Compromise that included the initial
form, *I offer to pay $10,000 of my $157,000 liability*.  Also
included attached financial statements for him individually
regarding his assets and his income and a financial statement
for Nurick & Associates, his business.

The accounts, the first two listed up here, are the
accounts that Mr. Nurick did list on his financial statements,
although he listed both of them with a balance of a thousand
dollars.  And as he conceded on cross-examination, there was
never an amount even close to a thousand dollars.  The balances
were always significantly higher.  The Clovis account had
$5,400; the Nurick & Associates account had 7,500.

And what other accounts did he have?  He had just
opened an account in the name of Downey Savings & Loan in the
name of Aztec Irrevocable Trust in December of 2000.  That

account had $13,000 sitting in it when he filed the Offer in Compromise with the IRS.  He did not list this account on the Offer in Compromise.

Now, you heard a lot of testimony about question 19-F and whether he had an interest in a trust, and there was some confusion about that, but Ms. Nguyen was consistent.  She said, *If he had told me he had a bank account that he had control of the money, he himself, not someone else, I would have told him to list it on the form.*

The next item listed is the Ansbacher Jersey account, $133,000.  As you recall, that was moved in January 3, 2001 to Mr. Biber.  Mr. Biber testified to you regarding that transaction, and Mr. Nurick, on cross-examination, admitted that the money was sitting there in Mr. Biber's account and then did sit there for a little while.  That was also consistent with Mr. Biber and Mrs. Biber's testimony.

So although it got transferred to a different account, he could have had access to that money if he wanted it.  He could have used it, instead of transferring it to Mr. Biber's account -- he could have used it to pay his taxes in full for 1995.

The last item listed is Luna de Los Crestones, the account at Banco Interfin that at that time, Revenue Agent Pugh calculated that at a minimum, it had a balance of $201,000.  So when you total all of this money from the time December 2000,

1    when he gets a notice from the IRS saying, *Thank you for your*

2    *amended return.  We agree you owe us $106,000.  You also owe*

3    *another 50,000 in interest.  Please send us the money.*

4         Between that five-month period, Mr. Nurick took many

5    steps to get rid of all of his assets so when the IRS was

6    evaluating his ability to pay in the Offer in Compromise, they

7    wouldn't find anything, and they would take much less than 100

8    percent of the balance due.

9         Now, we'll walk you through this chronologically to

10   show you what assets Mr. Nurick had during this time frame.  So

11   again the critical time frame we're focusing on is May of 2000

12   when the amended return is filed, April of 2001 when the Offer

13   in Compromise is filed.  So May 2001, he has -- I'm sorry.  May

14   of 2000, he has the Clovis Bank account.  If we could bring up

15   that exhibit.  And it shows it's in the name of his wife,

16   Eleanor Grochowski, lists his Shaver Lake address.  And as of

17   May 30th, the balance in this account was $7,685.  And at no

18   time during this month does it ever get below $3,900.

19        If we could go to the next exhibit, this is his

20   business bank account at Wells Fargo.  You can see on May 30th,

21   the balance is $50,000.  Go to the next exhibit.  Now, this is a

22   Currency Transaction Report.  Revenue Agent Pugh testified about

23   this and said that if a cash transaction is more than $10,000,

24   this form gets generated by the bank.  Date of the transaction,

25   June 1, 2000.  Mr. Nurick and his wife had just signed the

1    amended tax return.  Days before, mailed it into the IRS saying

2    *we owe $106,000.*  Within a week, Ms. Grochowski is at the bank

3    withdrawing $38,000.  Walks out with $38,000 in currency.

4            If we could go to the next exhibit.  Here is the

5    Ansbacher account, and this is for the time frame June, no less

6    than $126,000 in this account.

7            Now, we have a couple charts to show you Genesis funds

8    that were received by Mr. Nurick from 2000 and 2001.  One of the

9    points of factual dispute we have in this trial is whether

10   Mr. Nurick in fact was receiving Genesis funds and controlling

11   those funds after he filed the amended tax return.

12           Now, you heard Mr. Nurick testify that he sold his

13   interest in Genesis to Mr. Tinoco, and Mr. Laffer talked about

14   that, too.  When you go back in the jury room and look at all of

15   these exhibits, you will not find one document to support that.

16   It is only Mr. Nurick's word.  And you should establish his

17   credibility based on looking at the other documents and the

18   other testimony.

19           Recall that Mr. Nurick testified that he was getting a

20   fantastic return on Genesis:  three percent per month; 36

21   percent per year.  That's a huge return on investment.  It

22   doesn't make any sense if you're making that kind of money to

23   sell your investment.  If you're making 36 percent, why would

24   you sell it to someone else?  The answer is you wouldn't.  You

25   would keep control of it, you would keep collecting the money.

1          Mr. Nurick didn't want to pay his taxes because he

2    wanted to keep his money invested because he was making a lot of

3    money.  So from the time he filed the amended return, which is

4    the first date up here, May 30th, through January of 2001,

5    $281,000 that he received from Genesis, and based on the

6    testimony, it's not disputed, that money he received from

7    Genesis after 1999 would all be taxable, would all be a capital

8    gain.  So this is money he had available to him at the time he's

9    getting ready to prepare the financial statement that's going to

10   be attached to the Offer in Compromise.

11          The Offer in Compromise is signed on April 19, 2001.

12   Right after that, in the next four months, he gets over

13   $200,000.  Again, whether you want to say it's money he's

14   controlling because he still owns Luna de Los Crestones, which

15   is the government's position, or you want to say it's money

16   Mr. Tinoco is sending him, it's money available to pay his

17   taxes.

18          In this chart, we have over $487,000 that Mr. Nurick

19   had available to pay $106,000 liability.  This also does not

20   include the $140,000 he got from Mr. Biber.  So he had over

21   $600,000 during this 18-month time frame that he could have used

22   to pay his taxes in full.  He intentionally did not.

23          Now, this is a copy of the notice that the IRS sent

24   Mr. Nurick.  You can see in the upper right here, it's dated

25   December of 2000.  You can see right here, it says it's

1   regarding 1995.  You can see up here, the fax heading,

2   December 6, 2000.  And then focusing here, *as you requested --*

3   because he filed the amended income tax return for 1995 -- *here*

4   *is what you owe, $106,000; plus interest, $157,000.*

5           And again turning back to this fax that Mr. Nurick

6   sent to Lyly Nguyen, it's the same time he got this notice.

7   Now, this is how -- these type of documents are how the

8   government proves circumstantially what Mr. Nurick's intent was

9   when he was taking actions, when he was collecting money, when

10  he was spending money.  This document is dated right at the same

11  time he gets the notice, he says he doesn't have much money.

12  The evidence shows that is not true.

13          Mr. Nurick had assets of $133,000 in the Ansbacher

14  account in the name of NG Enterprises.  He also had

15  approximately $150,000 in equity in his cabin in Shaver Lake.

16  He also had control of the Banco Interfin in the name of Luna de

17  Los Crestones.  When he testified, he did not deny

18  NG Enterprises was his company, but he did not report the

19  existence of that account or the interest income from that

20  account to the IRS, to Tony Lam, or to Lyly Nguyen because he

21  wanted to conceal it from the government.

22          This is a copy of the Ansbacher account in the name of

23  NG Enterprises which shows that there is a balance of $133,000

24  in December of 2000.  So when Mr. Nurick is writing that fax to

25  Ms. Nguyen, he knows this money is sitting there.  From looking

1  at it before, we know the money has been sitting there for a

2  period of time.  He intentionally did not disclose it to her.

3         Also during this time frame, December of 2000, right

4  after he knows the IRS wants him to pay the taxes for 1995, in

5  his Clovis Community account that is in the name of his wife,

6  there are three different deposits that total $26,000 in

7  November and December of 2000.  In his business bank account,

8  Nurick & Associates at Wells Fargo, the ending balance the end

9  of December of 2000 is over $9,000.

10        Another bank account they have at Clovis has

11 approximately 21,000 at the beginning of December; has $11,600

12 in the middle of January, 2001.  Another account, savings

13 account has another $4,000, December 17, 2000.

14        Another account that had just been opened, because you

15 can tell previous statement, the balance says zero, so this is a

16 new account, in the name of Aztec Irrevocable Trust, there is

17 one deposit for $11,498, which was from Genesis funds, which is

18 available to Mr. Nurick.

19        He also had the 1999 GMC truck at this time.  He had

20 bought it about a year and a half before.  There is no question

21 that Mr. Nurick had the ability to pay his tax liability in full

22 when he gets that letter from the IRS in December of 2000.  No

23 question.

24        Now, the Court explained to you what the elements of

25 tax evasion are.  What the government has to prove is that he

1    had a tax due and owing, which we have just discussed, $106,452;

2    that he made some affirmative attempt to evade or defeat the

3    payment of that tax; and that he acted willfully.

4         Now, Judge Fischer listed some of the affirmative acts

5    that the government has charged him with, and I'm not going to

6    read them again.  I'm just going to emphasize the different

7    points:  the using of the Luna de Los Crestones account; having

8    the bank account at Banco Interfin in the name of Luna de Los

9    Crestones; not disclosing it to the IRS; and using it to hide

10   his ability to pay from the IRS.

11        He also used the account in the name of NG Enterprises

12   and transferred money from that account to his friend,

13   Mr. Biber; again, not disclosing it to Tony Lam, not disclosing

14   it to Lyly Nguyen, because it was money he had available to pay

15   his taxes.  He did not want the IRS to know that.

16        The withdrawing of the equity on his house, you heard

17   the testimony from John Biber.  You will see the property

18   transactions, the title, some of the title company's files and

19   the deeds, and you will see that he got $140,000 in February of

20   2001.  And we're going to show you a slide that is going to show

21   how he spent all that money.  What he didn't do was pay his

22   taxes with that money so that's one other affirmative act the

23   government is saying this is how we prove he intentionally

24   committed tax fraud.

25        Finally, the last two affirmative acts are regarding

1   the offer of the -- the Offer in Compromise that was filed.  Two

2   things were false about that:  one, that he didn't list all of

3   his assets; that he left off the bank account at Aztec

4   Irrevocable Trust; that he left off the bank account at Luna de

5   Los Crestones at Banco Interfin, which he still controlled.

6        The other part that's false is he said he had

7   insufficient assets to pay the full amount.  The records show

8   you there is no question that Mr. Nurick had the ability to pay

9   that $106,000 debt in full or the $157,000, when you add the

10  interest.

11       Now, this is the chart to help you understand the

12  timeline of events that we've just gone over.  First, the filing

13  of the amended return; Ms. Grochowski taking $37,000 out of the

14  bank right after it's filed; IRS sending him a notice saying

15  *send us the 106,000 plus interest*.  Within a month, he closes

16  that Ansbacher account, which you'll see was open for several

17  years.  You have the bank statements.  Transfers that money to

18  John Biber's account.

19       Another document he gets, January 15th, IRS Notice of

20  Intent to Levy.  He still has not paid.  IRS is sending another

21  letter saying *we are going to take more action if you do not*

22  *pay*.  So what does Mr. Nurick do?  He gets a Deed of Trust from

23  his friend, Mr. Biber, has it recorded at the Fresno County

24  Recorder's office, and now, instead of having $150,000 in

25  equity, when the IRS looks at his financial statement, now he

only has $10,000 in equity.  He has taken it from 150, because

he had a market value of about 250, which is what he put on the

Offer in Compromise which we'll look at in a second, and he owed

$100,000 to Bank of America.  So there's $150,000 of equity.  As

soon as he knows the IRS is going to take action, as soon as

he's discussing with Ms. Nguyen the potential Installment

Agreement to pay over time, they're discussing the Offer in

Compromise, with all of those things, he knows he has to fill

out financial statements and give them to the IRS.  And

Ms. Nguyen testified that that's how they would evaluate his

ability to pay.  So Mr. Nurick is engaging in intentional

conduct to make it very difficult for the IRS to know what

assets he truly owns.

          There's a series of cash withdrawals, and accounts are

closed at Clovis Community Bank.  Another IRS letter is sent on

March 12, 2001, regarding the Notice of Intent to Levy for

taxes.  And at this point, Mr. Nurick sends in $500 on the

$157,000 balance, and you heard testimony that's all he sent in.

He never sent in anything else for 1995.

          Now, you heard testimony from the Bibers regarding

that $140,000 loan.  And Mr. Biber testified that it was a good

business decision because he had a company, Elsden Corporation,

and he wanted to diversify, and so giving Mr. Nurick a loan with

seven percent interest was a good business decision for him.

          We also showed you a check, and I discussed it with

Mr. Laffer this morning, for $9,800 that was payment of the interest in full for the entire year on that promissory note. When Mr. Nurick testified, he said that he paid that full year of interest ahead of time because he didn't want it hanging over his head while he was moving to Costa Rica. So when he's paying money to his friend, he doesn't want it hanging over his head, and he pays a multimillionaire $9,800 way in advance of when he owes it. But when it comes to sending a check to the IRS, *well, we'll just kind of put them off and see if we can negotiate a much lower dollar figure.*

The $140,000 loan we will show you he deposits in Clovis Community Bank and spends within two weeks. Mr. Nurick admitted on cross-examination, none of that money went to pay taxes. So $500 is the only amount he ever paid for his '95 taxes. Mrs. Biber testified that she knew that the Nuricks had remodeled their cabin, and in fact Mr. Nurick admitted that August Construction had helped doing remodeling on his cabin in Shaver Lake.

Now, Mrs. Biber was also asked some questions about an animal charity, and there was some discussion with Mr. Biber and Mrs. Biber about whether it was a surprise and perhaps something that the husbands were going to hide from Mrs. Biber and Ms. Grochowski and surprise them later. The evidence does not support that story at all. That is, in fact, what it is, a story. The money is moved in January of 2001, $133,000.

1    Mr. Biber is a multimillionaire.  He says the banker calls him

2    and says *what do you want to do with this money*?  Well, then he

3    has some health issues, they talk about an animal charity.  Year

4    later, Mr. Biber goes down to visit Mr. Nurick in Costa Rica,

5    January of 2002.  Mr. Biber and Mrs. Biber both testified that

6    after that trip in January of 2002, so a full year after the

7    money is transferred, eight months after the Offer in Compromise

8    was filed with the IRS, *let's have some discussion about an*

9    *animal charity*, and it's such a surprise to Mrs. Biber, she's

10   doing the research herself.  So she does research.  They find

11   out it's too expensive.  It never happens.  Later in 2004, some

12   insurance policy is purchased.  There is no question, that money

13   was moved to hide it from the IRS.  Mr. Nurick and Mr. Biber

14   were good friends.  He transferred it, figured they would worry

15   about it later.  Well, as far as Mr. Nurick was concerned, as

16   long as it was hidden from the IRS and not connected to him, he

17   was okay.

18           The Ansbacher statement clearly shows -- because they

19   both had accounts at the same -- at Ansbacher, on January 3,

20   2001, NG Enterprises, Ltd., Mr. Nurick, transferred the $133,000

21   to Mr. and Mrs. Biber.  Then days later, the account is closed.

22   *Now, when I fill out that paperwork with the IRS, now I am not*

23   *going to disclose this asset because it's not in my name*

24   *anymore*.

25           THE COURT:  How much more do you have,

1  Ms. Hendrickson?

2          MS. HENDRICKSON:  Probably about ten minutes,

3  your Honor.

4          THE COURT:  Do you want to take a break?  No.  Go on

5  for ten minutes?

6          Okay.  Go ahead.

7          MS. HENDRICKSON:  This is a summary of what happened

8  with the $140,000 loan from Mr. Biber.  Money to August

9  Construction; money Mr. Nurick said was a down payment for his

10 son's house; legal fees to Ms. Nguyen; check to his brother for

11 medical expenses; the interest payment; cash withdrawal,

12 $20,000; more remodeling; another cash withdrawal.  Two weeks,

13 132,000 of that 140,000 is spent.  And IRS is not listed

14 anywhere.  Not even another $500.

15         Now, we're looking at what assets they have in April

16 of 2001 before they file the Offer in Compromise.  This Clovis

17 Community account ending in 0931, closed.  The next one, 0823,

18 at Clovis, also closed.  Now, April 2001, Mr. Nurick and

19 Ms. Nguyen both testified the money -- they're exchanging

20 information back and forth, faxes, talking on the phone, trying

21 to get all the paperwork together to file either the Installment

22 Agreement or the Offer in Compromise.

23         So what assets does Mr. Nurick have in April of 2001?

24 First of all, he has this account that has a balance of 5,000,

25 not 1,000.  He has the business account that has a balance of

1    7,000, not 1,000.  He has the Aztec bank account that has

2    13,000.  This is the schedule we showed you before.  Yes, he

3    moved the Ansbacher money, but he moved it into a friend's

4    account.  It was just parked there.  He had access to it.  So he

5    had a total of $361,000 he could have used to pay the IRS.  He

6    intentionally did not.

7           Now, Luna de Los Crestones you have heard a lot of

8    testimony about and a lot of questions about, and we're going to

9    show you his control of that account which shows it's his

10   account.  First you have the minutes that list Luna de Los

11   Crestones, that say Mr. Nurick is the authorized person and

12   gives his Shaver Lake address.

13          He's the one applying for a credit card, and on the

14   paper copy -- it's hard to read up here -- you will be able to

15   see it says *Luna de Los Crestones*.  Then on the Spanish version

16   of this, you will see his original signature and his passport

17   information.  A $60,000 wire transfer I just showed to

18   Mr. Laffer, money going from NG Enterprises to Luna de Los

19   Crestones.  It's Mr. Nurick's account.  That shows the transfers

20   I went through with Mr. Laffer.

21          Then there is documentation requesting a transfer of

22   $48,000 payable to his wife, Eleanor Grochowski, from Luna's

23   checking account.  Here is a copy of the check, July of 2000,

24   $48,000 payable to Eleanor Grochowski and in fact goes into

25   their bank account in Clovis.

1          Floors, Cabinets & Fixtures, these I just went over

2    with Mr. Laffer, clearly Mr. Nurick is directing where these

3    funds are going.

4          Robert Nagle, Mr. Nurick testified that he redid old

5    cars, so he got $8,000 for some work he did.  Nurick &

6    Associates, Inc., another $10,500, from Luna de Los Crestones.

7    Mr. Nurick's bank account.  That's a copy of the check.

8          The Genesis funds received, again I went over it with

9    Mr. Laffer.  It doesn't make any sense to say Luna de Los

10   Crestones is not his account because he reported more to the IRS

11   than we can trace to him in 1999 and in 2000.  He reported

12   $285,000 in '99.  In 2000, we could trace $303,000 to him, again

13   including the transfers to Luna de Los Crestones, and that

14   $48,000 that we just saw is right here, so it's money that came

15   from Luna de Los Crestones.  Mr. Laffer included that in his

16   computation.  He just didn't include the check that went

17   directly there.  Well, the government submits there's no

18   distinction there.  Mr. Nurick is controlling everything that is

19   going on with this account.

20         2000 he reported more than we could trace to him.

21         If you credit what Mr. Laffer said, then there is

22   another $140,000 somewhere in some other bank account that the

23   government doesn't know about that Mr. Nurick also received

24   Genesis distributions in.  What makes more sense is that it's

25   Luna de Los Crestones he controls and he has controlled '99,

1    2000, and 2001.  Same thing for 2000.

2         We'll just move on.  June 2000, this is the summary of

3    the Genesis funds that Ms. Nguyen prepared and I showed to

4    Mr. Laffer, and his schedule and the government's schedule,

5    neither of them include any money for 1997, but Mr. Nurick told

6    Ms. Nguyen he had $44,000.  Mr. Laffer testified Mr. Nurick's

7    records are better than what had been introduced here, and at

8    least based on this one document, Mr. Nurick has some other bank

9    account the government is not aware of and could not trace money

10   to him, so there is no question that he is controlling Luna de

11   Los Crestones.  He's profiting from that money and continues to

12   spend it.

13        The government showed total amounts received of

14   $1 million to him.  Remember what Revenue Agent Pugh said.  She

15   did not include a distribution in her chart unless we had both

16   sides of the transaction, so Mr. Laffer's chart has more money,

17   and the government agrees that the bank records that you have in

18   evidence support that he did get more distributions, but if we

19   weren't able to tie it directly to him, then it was not included

20   in this chart.  And again the important point about this is that

21   he's receiving money from Genesis '95, '96, '97, '98, '99, 2000,

22   2001, 2002.  He could have used that money from '99, 2000, 2001,

23   2002 to pay his 1995 income taxes.  He intentionally did not.

24        Teresa Vogt testified that the sources of the checks

25   were all distributions from Genesis so there's no dispute the

1    Genesis money is being distributed.  The dispute is over

2    Mr. Nurick's control.  When you look at the summaries the

3    government has prepared, when you look at the bank records, when

4    you look at all of the evidence and how it corroborates the

5    testimony of the witnesses and how it shows what Mr. Nurick did

6    with the money, then your only conclusion will be that the

7    government has proved beyond a reasonable doubt that Mr. Nurick

8    has intentionally committed tax fraud and did not pay his 1995

9    income taxes on purpose, and it will be your duty to return a

10   verdict of guilty.

11           THE COURT:  All right.  Thank you.

12           Ladies and gentlemen, don't talk about the case or

13   form or express any opinions about the case until it's finally

14   submitted to you.  We will take a 15 minute break.

15                   (Recess taken)

16           THE COURT:  Everyone is back.

17           Mr. Lombard, you look like you're ready to go.  You

18   may proceed.

19           MR. LOMBARD:  Thank you, your Honor.

20                   *Defense Closing Argument*

21           MR. LOMBARD:  Government counsel is correct about one

22   thing in this case, that this is a case about choices, and the

23   choice that the government made is that if you don't pay your

24   taxes when they want you to pay them, they're going to indict

25   you.  That's the choice they made.

1          Mr. Nurick made the choice to pay his taxes over a

2     period of time.  Not once did we hear government counsel talk in

3     her closing argument about the Installment Agreement request,

4     the document that was in Mr. Nurick's lawyer's file, the one

5     that she filled out, gave to him, he signed, and she didn't file

6     it.  And yet it looks -- looking from the government's

7     perspective, he amends his taxes, creates $100,000 tax

8     liability, and then they look at the tax summary sheet as to how

9     much money does he owe, and all they see is a $500 payment and

10    then an Offer in Compromise, and they don't see the Installment

11    Agreement.

12          Yeah, that would seem egregious.  How dare he insult

13    the Department of Justice or, I should say, the IRS when you owe

14    $100,000 and you only pay $500.  But there is another side to

15    the story.  And that's the side of Lyly Nguyen, and Lyly

16    Nguyen's testimony is uncontradicted.  It's corroborated, and

17    she tells you she messed up.  And she wouldn't talk to me.  She

18    wouldn't talk to my investigator.  She wouldn't talk to

19    Mr. Laffer because she knew she messed up.  She hired a lawyer.

20    The judge read you the instructions.  And I want you to pay

21    attention to those instructions, specifically the reliance on

22    counsel defense.  Because this is a specific intent crime.  And

23    I said it in the beginning and I'm saying it now.  What was

24    going on in Mr. Nurick's mind, his intent, his intent, his

25    intent.

1          And we know what his intent was because of what Lyly

2    Nguyen said on the stand and the documents that were in her

3    files and the evidence in this case, and, ladies and gentlemen,

4    I want to make sure we all understand here, testimony is

5    evidence.  There is hundreds of documents here.  That's

6    evidence.  There is also testimony, and that is evidence.

7          Mr. Nurick relied on his lawyer.  He told her what his

8    situation was.  He sought her advice, and she gave it to him,

9    and he followed it.  No thank you anymore, Ms. Nguyen.

10          The government and Mr. Nurick see this case entirely

11   different.  Mr. Nurick's position, very straightforward:  *My*

12   *intent is to pay the taxes*.  How do you know that intent?

13   *Because of the steps I took*.  When do you know Mr. Nurick went

14   and contacted Lyly Nguyen?  1999.  Not in 2000, not in 2001.  In

15   1999.  And when I asked Ms. Nguyen was there any reason that you

16   would meet with Mr. Nurick other than a business relationship,

17   her answer was no.  And you know the reason why he went there is

18   to fix his taxes.  That's his state of mind.  That's the

19   earliest point we have here as to what is going on in his mind

20   back in 1999.

21          He hired her in 1999.  Then he amended his returns in

22   May of 2000.  So summer of '99, I believe her testimony was, all

23   the way true through the fall of 1999, and then by May he is

24   filing his amended returns.  And then the next thing he does --

25   that's two steps, I would submit to you, of his intent.  Two

steps:  hiring a lawyer; filing amended returns.  Third step is

he files or executes a Power of Attorney.  Why would he execute

a Power of Attorney?

          In November of 2000, Mr. Nurick testified, Ms. Nguyen

testified for resolving the tax liability.  He paid or he

amended his return in May of 2000 so now he has got to figure

out how to deal with the money that he owes.  So what does he

do?  He executes a Power of Attorney.  And let's put this in

context.  He is going back and forth to Costa Rica.  He is

thinking of retiring there, and so he says to his lawyer, *handle

it*.  November of 2000.  Then he comes back in January of 2001 so

now we have got the next time he makes a step to amend or to pay

his taxes.  He meets with Ms. Nguyen January 6th of 2001 in her

office, and there he discovers the Power of Attorney that he had

given her wasn't complete.  He needed his wife's signature, and

while he was there, they both executed the Installment

Agreement.  And so if you look --and you'll have these documents

back there --and, ladies and gentlemen, I'm going to try to

avoid showing you documents and talk to you because we've seen

enough documents, and now it's time to understand what it means.

But, please, take your time and go through all the documents in

this case.  Mr. Nurick is not afraid of these documents.  They

support what his position is.

          So if look at the Installment Agreement and the Power

of Attorney, you will see Mr. Nurick's signature in November of

1  2000 for the Power of Attorney agreement, Power of Attorney

2  form.  And then you will see underneath his signature, his

3  wife's signature for January 6, 2001, where she forgot to sign

4  or she didn't sign.  And then in January, they both are still

5  there, and that's when they execute the Installment Agreement.

6       What I told you in opening arguments was that in

7  Mr. Nurick's mind, his tax matters, regardless of what's

8  happening in the rest of his world, he's got a plan to pay over

9  time.

10       And while I'm thinking about this, I want to mention

11  this to you.  Mr. Nurick did not get rid of his assets, all of

12  his assets.  He has Aztec Irrevocable Trust; had almost $600,000

13  in it.  He didn't get rid of that.  I will talk to you about

14  that in a second, but that's not true.  If he had gotten rid of

15  all his assets, you wouldn't see Aztec on here.

16       So getting back to this, so there he is.  He's on his

17  way to Costa Rica.  He signs an installment agreement request.

18  He has hired his lawyer.  He has paid her money.  He has amended

19  his returns.  These are steps that show his intent.  And it

20  shows that he relied on his lawyer because his lawyer is telling

21  him what to do.  So then he calls -- he calls his lawyer from

22  Costa Rica, and she says *have you made your good faith payment*?

23  No, he hasn't.  *I didn't know I had to.  Well, you need to make*

24  *it.*  So what does he do in March?  He makes a $500 payment, the

25  same amount that's on the Installment Agreement request.

1    Coincidence?  Or is that really what happened?  And the

2    government doesn't want to talk about it.

3            Let me also show you how we know there was an

4    Installment Agreement.  And Ms. Nguyen, she messed up, ladies

5    and gentlemen.  I'm sorry.  That's just the way it is.  She gave

6    bad advice, and she didn't do what she was supposed to do.

7            I'm going to show you this exhibit.  This is Defense

8    No. 4.  It's also in the government's evidence.  December 4,

9    2000, that's when this document was in Ms. Nguyen's possession,

10   at least at that date.  She writes, and she later testified,

11   that really she meant January 4, 2001.  *IRS will make note to*

12   *receive agreement by Friday, January 12, 2001*.  There will be a

13   calendar -- I have a defense exhibit in there that's a calendar

14   that will show you Friday is January 12th, 2001.  She means

15   agreement, Installment Agreement.  That's what that is.  That

16   shows you.  It wasn't like the Installment Agreement just

17   appeared out of thin air.  I would suggest she is almost

18   borderline incompetent where she's messing up the years and not

19   filing stuff and giving bad advice.

20           So that is his intent:  Hires a lawyer; amends his

21   returns; signs a Power of Agreement; signs an Installment

22   Agreement request; makes a $500 payment.  That is his intent.

23   And you know that he relied on his lawyer because she told you

24   that's what she told him to do.

25           The government -- ladies and gentlemen, I do submit

that it really is that simple.  The government didn't have the
Installment Agreement prior to this trial.  Mr. Nurick, they've
been after him for 11 years, ladies and gentlemen.  He doesn't
trust this government.  Who knows?  How would they turn that
against him?  The government has spent a considerable amount of
time on what I would submit to you are distractions, red
herrings, or irrelevant, like Denise Taylor-Fraser and Teresa
Vogt.

They're determined to get Mr. Nurick.  Over the past
11 years, they've taken his life, looked under ever single rock,
every single bank document, every single non-financial document,
and they twisted it and contorted it to make you think, to try
to tell a story that he had ulterior motives.  He's a smart man,
ladies and gentlemen, but he had this grand plan from 1995 to
evade payment?  All these things he did?  It's a stretch.  And
sometimes when you look at the simplicity of it, it is just that
simple.  He had an agreement, and his lawyer didn't file it.

Mr. Nurick is an honorable man, ladies and gentlemen.
There is no evidence in this trial to suggest otherwise.  He
took the stand and told you he is 76 years old.  He has served
his country in the Army.  He has worked for the government in
top military jobs.  A married man with kids.  And he's paid
taxes every single year that he has worked in his adult life.
You didn't hear any disagreements about that.  He probably has
paid taxes longer than most of us in this room, if not all of

us.

The idea that he would amend his taxes and then not pay them is counter-intuitive.  It's Ms. Nguyen who abandoned my client.  It's Ms. Nguyen who failed to do her job, and it's Ms. Nguyen who gave him bad advice.

Use your experience, ladies and gentlemen.  Use your common sense.  Put yourself in Mr. Nurick's position.  Think about how if the IRS came after you and second-guessed every decision you made financially and then took it and created a different story than what your intention was, what would you do?  Mr. Nurick got up and took the stand and told you what his intentions were.  They asked him on cross-examination *why did you stop paying the $500?  Why did you stop paying?*

*I thought it was wrong.  You're going to come after me when I tell you I owe a tax and I'm going to pay and now you're going to come after me*?

I'm going to get into the evidence a little bit more detailed, but before I get there, I want to talk about a couple of the legal principles, the pillars of our foundation here in the criminal justice system in the United States.

And the judge mentioned them briefly.  She read the instructions, and you will have them back in the jury room with you.  But, ladies and gentlemen, I said something to you in the very beginning -- I don't know if you remember, but I gave a little mini opening right here, and I said *Mr. Nurick will*

*prove*, and I kicked myself, and I've been kicking myself ever since I said that because Mr. Nurick doesn't have to prove anything.  It's the government that has the burden of proof. Mr. Nurick could sit here quiet, not say a single thing.  He didn't have to testify.  He didn't have to call witnesses.  It's the government that has the burden of proof, and it never shifts.  It's the government that must prove to you beyond a reasonable doubt that Mr. Nurick's reliance on his counsel's advice was not in good faith.  He has presented -- he has told you *I relied on my lawyer*, and she testified that yeah, that's the advice.  It's the government's duty to come to you and prove beyond a reasonable doubt that that's not true.

      Mr. Nurick is presumed innocent.  This is a big government.  This is the Department of Justice sitting in this courtroom today.  If you can't understand anything in this case, if you're confused, if you wish a question had been asked from a witness, don't look at him.  You look at the government.  They have been waiting 11 years for this day.  It's not Mr. Nurick's burden; it's the government, and it doesn't change.

      So what is their burden?  Their burden is they have to prove beyond a reasonable doubt.  The highest standard we have here.  It's always required, and it's not just *clear and convincing*.  It's not *probably*.  It's not *most likely*.  It's *beyond a reasonable doubt*.  Beyond a reasonable doubt, ladies and gentlemen.  There is an instruction as to what that is that

1   you will read, but I submit to you in this case, they have not

2   met their burden of proving their case beyond a reasonable

3   doubt.  If you have some doubt, Mr. Nurick is not guilty.

4          The three jury instructions that I want you to pay

5   particular attention to -- they're all important, but three of

6   them are particularly important.  The first is the

7   reliance-on-counsel defense.  The second is what is an

8   affirmative act.  And the third is what is willful, when an

9   affirmative act is willful, did Mr. Nurick act willfully.

10          Reliance of counsel.  Two parts here.  One is the

11   Installment Agreement and the other is the Offer in Compromise.

12   Mr. Nurick relied on his counsel when he amended his returns,

13   which now Mr. Laffer tells us maybe he shouldn't have done that.

14   He didn't have an obligation.  The statute of limitations had

15   lapsed.  But yet Mr. Nurick listened to Ms. Nguyen.  He amended

16   his return, and then when he had the tax liability, he asked his

17   lawyer *What do I do?*  And she said, *You got three choices:  pay

18   it, Installment Agreement, or Offer in Compromise.*  She advised

19   him the Installment Agreement.  She said that.  So that's his

20   first reliance-on-counsel defense.  If you rely on your counsel,

21   then there is no specific intent to commit a crime because it's

22   your lawyer who is telling you.  If you don't tell your lawyer

23   something when you rely on counsel, yeah, that's a problem.  But

24   that's not what happened here.  Ms. Nguyen knew what was going

25   on.  She knew about Aztec.  She knew about Kevin Mirecki.

1          Let me just take a step out of this discussion to say

2     when there's questions about Ansbacher and whether or not

3     Ms. Nguyen knew about Ansbacher, that relates to the Offer in

4     Compromise in April of 2001, not the Installment Agreement

5     request.  And you know Mr. Nurick in his mind didn't own

6     Ansbacher in April of 2001.  So whether or not he told

7     Ms. Nguyen or not about Ansbacher at the time that the Offer in

8     Compromise was filed is not relevant, because he didn't own it.

9          So getting back to the reliance on counsel, there's

10    the Installment Agreement, he relied on his lawyer, and then

11    there's the Offer in Compromise.  The government has to prove

12    beyond a reasonable doubt that he had the specific intent to

13    evade payment of '95 taxes.  And the law will tell you -- the

14    law, not Mr. Lombard, not Mr. Nurick, not government counsel.

15    The law tells you that so long as Mr. Nurick made full

16    disclosure of the material facts -- material is important -- the

17    ones that matter, as long as he did that to his lawyer and she

18    gave him advice on that and he relied upon that advice in good

19    faith, he's not guilty.

20         *Affirmative acts of evasion*, and there's a list of

21    them.  They will be in the instructions.  But, ladies and

22    gentlemen, me walking into this courtroom is an affirmative act

23    to take a step forward.  But just taking a step forward, there

24    is nothing wrong with it unless I have the intent.

25         It's one thing to make -- to do affirmative acts, do

things.  It's another thing to do it with the intent to evade
payment, and that's what the government must prove beyond a
reasonable doubt.  That he took affirmative acts with the
specific intent to not pay his '95 taxes.  Look at Jay Lashlee.
Mr. Lashlee -- it was his advice to Mr. Nurick to *create trusts*
*for every piece of asset have you*.  That was in '95 when
government counsel asked him, *did you own this trust, did you*
*own this trust, did you own this trust*?  Those are old trusts.
The question is was he creating those with the intent to evade
his taxes?  No.  It's called asset protection.  Would I do it or
would you do it?  It's a different story.  But Mr. Nurick got
advice from Mr. Lashlee.  That's what he did.

        Ladies and gentlemen, the second most important part
about affirmative acts is that you always must agree with one,
at least one of those affirmative acts.  If you don't agree that
there is a specific intent to evade payment of -- based on an
affirmative act, if you disagree, he's not guilty.  The
government has taken a shotgun of pellets and thrown them out
there.  Ladies and gentlemen, that's not enough in this case.
It has to rise to a much higher level.

        The third is willfully.  That he had a duty, that he
had a tax to pay, and that he intentionally and voluntarily
violated that duty.  *I intentionally* -- or Mr. Nurick
intentionally and voluntarily avoided payment.  That's what the
instruction of *willful* is.  That's what has to be willful.  So I

1    ask you to ask yourself when he went and hired Ms. Nguyen, what
2    was his intention?  I ask you to ask when he signed that
3    Installment Agreement request, what was his intention?  I ask,
4    when he gave Power of Attorney to her and when he paid the $500,
5    what were his intentions?  Was he just doing an act for the sake
6    of doing it?  Or did he have something in mind?  I submit to you
7    that he definitely had something in mind, pay his taxes.
8            So he didn't pay all at once.  Is that a crime?  In
9    the United States, long ago, there used to be a debtor's prison,
10   18th Century, where if you didn't pay your taxes, you went to
11   jail.  That's not the way it is anymore.  You don't go to jail
12   for not paying your taxes.
13           There is one other element of evasion of payment that
14   I want to address, and that is there must be a tax due, and now
15   after I -- we hear Mr. Laffer testify, there is a real question
16   as to whether or not there is even a tax due.  Mr. Laffer told
17   you that based on his examination of the records and talking to
18   Mr. Lashlee and hearing Mr. Nurick testify and all the documents
19   that are in this case, he doesn't see anything to contradict
20   that the IRA IB-Control Trust was not a valid rollover.
21   Mr. Nurick went to Ms. Nguyen ask said, *I think I got problems*
22   *with my rollover.*  He may never have had a problem to begin
23   with.
24           So let's talk about the reliance-of-counsel defense a
25   little bit more in depth.  Ms. Nguyen was introduced to my

1    client in the summer of 1999.  He came to her and said he had

2    problems, he believed, with his rollover.  She looked at it, and

3    she said, *Okay, we need to file an amended return for '95, '96,*

4    *'97.*  What did he do?  He filed amended returns for '95, '96,

5    '97.

6          The government wants to tell you that Mr. Nurick knew

7    about his taxes when he received the subpoena in 2000, but you

8    know that's not true because Lyly Nguyen tells you *I met him in*

9    *'99.*  They also introduced Denise Taylor-Fraser and Teresa Vogt

10   to say that he knew about the Genesis tax ability in a meeting

11   in Costa Rica in the 2000.  You know that's pure speculation

12   because again Ms. Nguyen told you when she met him and why he

13   was there.

14         So he files the amended returns, and what's he do?  He

15   goes back to her.  He doesn't know it, but she's already

16   possibly given him bad advice.  She says, *You need to now file*

17   *an Installment Agreement request,* so he listens to her.  She

18   fills out the form, just like she testified, and he signs a

19   Power of Attorney, and she advised him that she would take care

20   of it while he was gone to Costa Rica.

21         She doesn't do that.  She can't do it because there is

22   no full Power of Attorney for him.  His wife didn't sign.  He

23   comes back, he finds out, *okay, you didn't file it, let's get it*

24   *right, here are the signatures, there you go.*  Ms. Nguyen, does

25   she do it?  No, she doesn't do it.  Why doesn't she do it?  I

1    would submit because she's a bad lawyer, that's why.  She told

2    my client to make a good faith payment of $500 in March.  You

3    know she's talking to the IRS about it.  There is another

4    exhibit, Defense Exhibit 1006.  It's dated January 15, 2001, and

5    you look at her handwritten notes.  That's supposed to be a

6    2001.  She is making mistakes of the year, and this man is under

7    scrutiny of the IRS, and she can't even get the dates right.

8    *Extension five weeks from today*.  I submit to you the five-week

9    extension is for her filing the installment request.

10            So then she calls Mr. Nurick and asks -- or he calls

11   her, one or the other, *Why haven't you been making your good*

12   *faith payment*?  *Okay.  I'll make my good faith payment*.  Nothing

13   there to indicate that Mr. Nurick should know that she hasn't

14   filed the request.  And, ladies and gentlemen, if you have any

15   questions that you want to ask those witnesses that would make

16   it more clear in your mind, you look to them.  Mr. Nurick took

17   the stand, and I'm going to talk to you about Luna de Los

18   Crestones in a second, but if you want to know where is the

19   contract, Mr. Nurick got up there and testified, *I sold an*

20   *interest to Andre Tinoco, Luna de Los Crestones*.  The government

21   had the opportunity to cross-examine him on those issues, find

22   out more about it, but they didn't.  So now you know his

23   testimony is evidence, and it's uncontradicted, and you have to

24   accept that.  You can weigh his credibility, but that's the

25   evidence.

         Ms. Nguyen took the stand.  You want to know why she

didn't file that?  I asked her.  She said, *I don't know if I*

*filed it.  I don't recall.*  Incompetent is what I suggest.  But

if you want questions asked of those witnesses that weren't

asked, it's their burden, it's their job, and if they didn't ask

it, I'll tell you why; it would have helped Mr. Nurick.

         So Mr. Nurick -- I submit to you his intent has been

established when he executes these documents.  Several steps

he's taken, and I won't repeat them again because I think we've

belabored the issue, but certainly he had an Installment

Agreement request in his mind on track, whether you call it

*filed*, *going to be filed*, *in the process*, *down the line*, that's

what was happening based on the documents.  And all based on the

advice of his lawyer.  And I submit to you that there is no

contradiction of those facts.  Those are the facts, and they're

not -- but they're documents and they're untested, and that

alone, ladies and gentlemen, tells you Mr. Nurick is not guilty.

No one came in here and said the Installment Agreement was

false.  No one says his lawyer didn't advise him to do that.

         Yet despite helping out enough with Mr. Nurick's tax

problems, Lyly Nguyen, once again, volunteers to help him more.

She says *we should file an installment* -- I mean, an Offer in

Compromise while the Installment Agreement is pending.  Great

advice, Ms. Nguyen.  Mr. Laffer tells you there's no way that he

would qualify for an Offer in Compromise.  But yet Ms. Nguyen --

1   let me -- Mr. Nurick, no education when it comes to taxes.  He

2   may be a smart man, ladies and gentlemen, but use your common

3   sense.  There are lots of smart people we know in our lives,

4   probably most of you -- I say *probably*, I know most of you are

5   smart, but does that make you an expert in some other area?  I

6   am a criminal defense lawyer.  Does that mean I know about fluid

7   dynamics?  The government wants you to attribute my knowledge as

8   a criminal defense lawyer now to fluid dynamics.  That is what

9   they are asking you.  He is an engineer.  We're going to hold

10  him to the standard of Lyly Nguyen who went to law school and

11  has an LLM, an advanced degree, in taxes.  That's the kind of

12  standard we're going to put on him.  Is that right?  No, that's

13  not right.  That's why he hired her.  That's why he paid her

14  money.  She's an expert.

15       Mr. Nurick testified he was reluctant.  We have an

16  installment request; why would we need an Offer in Compromise?

17  Uncontradicted.  She advised him, and she tells you, *I advised

18  him,* and you know Ms. Nguyen is telling the truth.  She was

19  afraid to talk to me.  She has her own lawyer.  She filled out

20  the Offer in Compromise, and I just want to submit to you,

21  ladies and gentlemen, that my argument to you is that his intent

22  has already been proven to you.

23       What happened in the Offer in Compromise, what

24  happened at Shaver Lake, what happened with John Biber and

25  Ansbacher are irrelevant.  I mean, they may be peripherally --

1  peripherally, way out in the boundary, some indicia of what was

2  going on in his life, but what came first and what sets

3  precedent to his intent is the installment request, so this

4  Offer in Compromise is something that confuses the issue, in my

5  opinion, and what I submit to you, it does because he already

6  has something.  He has already taken care of his taxes.

7         Now, who fills out the Offer in Compromise?  She does.

8  He's in Costa Rica.  She faxes it down to him.  He tells you

9  that *I'll sign it but don't submit it until I get back because I*

10  *want to review it.*

11         Lyly Nguyen is familiar with Mr. Nurick's tax issues.

12  This was in April of 2000 -- January, February -- April 19,

13  2001, the Offer in Compromise is submitted.  She has known him

14  now since summer of '99.  She's introduced him to Tony Lam,

15  whose office is in her office, essentially.  She pays -- he pays

16  Lyly Nguyen who pays Tony Lam.  Tony Lam essentially works for

17  her.  She oversees what he does.

18         Tony Lam filed his 2000/2001 taxes.  His Aztec

19  Irrevocable Trust is on his taxes.  The idea that she didn't

20  know what his status is is just not credible.  She knows what

21  Nurick Associates is.  She knows his bank accounts.  What is she

22  doing in his life.  She's helping with his taxes.  And she knows

23  about Aztec.  And how do you know she knows about Aztec?

24  Because she told us:  *Mr. Nurick had too many uncertainties so I*

25  *advised him to check no.*

1          Ladies and gentlemen, forbid the day when you go to a

2   lawyer and you tell them you're confused and they give you wrong

3   advice and then you get criminally prosecuted for it.  It was

4   her advice to check *no*.  It wasn't his.  He relied on her.  That

5   is not guilty of his -- I should say that shows that he didn't

6   have that specific intent, which means he's not guilty.

7          Mr. Nurick said he faxed the form from Costa Rica.

8   This was in 19 -- this was in 2001.  We're in 2011 here, ladies

9   and gentlemen.  Look at the signature page on that document.

10  Use your common sense.  Mr. Nurick, I would submit to you, is

11  right.  The faxes weren't that legible back then.  Look at that

12  signature page, and you understand why Mr. Nurick said *wait*

13  *until I get back to review this whole document* because she faxed

14  everything to him.  It wasn't like he was in her office filling

15  out the Offer in Compromise and going over it.  It's all round

16  numbers.  And, ladies and gentlemen, you -- before I get there.

17  I'm getting ahead of myself.

18          So he filed the Offer in Compromise at her advice

19  based on his discussion with her, and at this point, no reason

20  not to trust her.  That's the reliance-on-counsel defense, part

21  2.

22          Now, I have to address all of this because the

23  government has alleged the shotgun approach of intent, but my

24  main point is the installment request.  But I'm going to address

25  each of them and, certainly with the Offer in Compromise, he

1   relied on his lawyer.  And the evidence corroborates that.  She

2   corroborates that.

3          Lyly Nguyen played it fast and loose.  She is now, I'd

4   submit to you, probably much more careful.  But she played it

5   fast and loose.  *Oh, just fill it out here, sign it.  We'll have*

6   *a chance to correct it when it's actually assigned to an agent.*

7   And you know that's the process because Mr. Laffer told you, she

8   told you, and her experience, when you file an Offer in

9   Compromise, yeah, it's an offer, and it might not work, and once

10  it gets to a revenue officer, then you get an opportunity to

11  correct it.

12         Oh, so when Mr. Nurick told Ms. Nguyen that *I forgot*

13  *my truck*, what happens?  The hatchet comes down.  Nope.  That's

14  indicia of your evasion of payment.  That's what the government

15  tells Mr. Nurick.  Mr. Nurick goes to his lawyer.  Imagine that,

16  ladies and gentlemen, you're sitting with your lawyer and you

17  say, *I made a mistake and I need to correct it*.  Your lawyer

18  says, *Just wait, just wait a bit.  We'll have a chance to*

19  *correct that*.

20         Okay.  *I'll rely on may lawyer.  She's a lawyer.  She*

21  *has an LLM in tax.  She is a specialist in this area.  I'm*

22  *paying her.  She's led me through this maze that I -- from 1995,*

23  and then right when you think it's going to happen, all of a

24  sudden the government says, *No, you don't get a chance to do*

25  *that.  You don't get a chance to correct it.  In fact, we're*

*going to use it against you.*  What a slap in the face that is.

By Ms. Nguyen, by Mr. Nurick and his intentions.  She played it

fast and loose, and Mr. Nurick is paying the consequences as we

sit here today.

She advised him about Aztec.  And you know in 2000,

2001, Aztec -- Aztec is a Genesis investment where it goes, and

2000, 2001, Kevin Mirecki was the trustee.  It was Kevin

Mirecki's responsibility to identify.  Mr. Pastor told you that.

It was his responsibility to identify Aztec, and then when

Mr. Pastor said, *No, Mirecki doesn't know what he's doing*,

Mr. Nurick gave that responsibility to Ms. Nguyen, and that's

when you see Tax Law Services, ITF, I think, *in trust for*, Aztec

Irrevocable Trust.

So he took it from Kevin Mirecki, who Mr. Pastor said

he doesn't know what he's doing, and he gave it to Ms. Nguyen

because he still trusted her and she knew what she was doing.

THE COURT:  Mr. Lombard, could you slow down a little

bit?

MR. LOMBARD:  Yes, I am sorry.  I apologize.  I get

excited sometimes, even though it's a tax case.

Once Mr. Nurick realized that he was getting C-team

advice, he went to Mr. Pastor, Harvard Law School, Assistant

United States Attorney, Assistant Chief of the Criminal Division

of Tax, and he got some A advice, A-team advice, but by then,

ladies and gentlemen, it was too late.

1          And what does the C-team lawyer do when it's based on

2   her advice that he gets indicted?  She says, *I'm not talking to*

3   *you*.  I'd submit to you -- to me, to Mr. Laffer.  I'd submit to

4   you that's further indicia of her incompetence.

5          Now, the government specifically -- they allege

6   specifically five things that I've kind of touched on that

7   Mr. Nurick did to evade payment.  The first thing is to create

8   and use Luna de Los Crestones as a corporation and the bank

9   account associated with it.  The second was the use of the

10  Ansbacher money to give to John Biber.  The third was

11  withdrawing equity.  Fourth was filing the Offer in Compromise

12  as doubt to collectability, and the fifth is the 433-A, which,

13  ladies and gentlemen, I submit is the same thing as the Offer in

14  Compromise, but in the 433-A, they say he didn't include as

15  assets a truck, Aztec, and Luna de Los Crestones.  Those are the

16  specific acts they're alleging, that he took affirmative acts

17  that they have to prove beyond a reasonable doubt, that he

18  willfully evaded payment.  So let's talk about Luna de Los

19  Crestones.

20         Where, where, where is the evidence of incorporation,

21  the corporate documents that show us that Mr. Nurick owned Luna

22  de Los Crestones?  I've told you it's their burden.  They showed

23  you a credit card, some minutes.  There is no articles of

24  incorporation, there's no bylaws, none of the documents that

25  would indicate that this man owned that company.

```
 1              Mr. Laffer told you just because you see money going
 2    from one account to the other is not indicia of ownership.
 3    Ladies and gentlemen, the United States is sitting right here at
 4    this table.  They could have brought you an expert on Luna de
 5    Los Crestones -- on corporations and told you what is necessary
 6    to form a corporation.  They could have told you -- they could
 7    have brought you Andre Tinoco, whose name and official signature
 8    is on the back page of the documents that mention my client's
 9    name.  Where is he?  If you have questions about that and they
10    want you to believe that he owned that and he tells you he
11    didn't, then that's evidence.  And you want something more firm
12    than that.  You look to them; you don't look to Mr. Nurick.
13    It's their burden.  And I'll submit to you the reason you don't
14    see corporate documents, bylaws, shareholders minutes, is
15    because he doesn't own it, and they don't want to prove it to
16    you because they can't.
17              Mr. Nurick got up here -- he didn't have to get up --
18    and he took the stand and he told you he was available for you,
19    ladies and gentlemen.  To whatever the government wanted to ask
20    him about his actions, he was available.  And not until
21    Mr. Laffer got up here on the stand did they decide to question
22    contracts, documents.  Why didn't they ask Mr. Nurick those
23    questions?  I'll tell you why.  Because they knew that
24    Mr. Nurick had sold his interest to Mr. Tinoco at Luna de Los
25    Crestones.  And if you wanted the government to ask those
```

1   questions and you didn't get those answers, then you hold it

2   against the government because they know what their job is.

3   This is not their first rodeo.

4            And, ladies and gentlemen, government counsel makes a

5   big deal of why sell if he's making such great returns?  I'll

6   tell you why.  Mr. Nurick told you why.  *I owe taxes all of a*

7   *sudden on three years.*  So why did he sell his interest?  Look

8   at the charts.  He sold his interest because now he had not just

9   '95 because he treated '95 as a rollover, he had '96 as a

10  rollover and '97, and he owed taxes and he needed money.  So,

11  yeah, he sold his interest.  And he didn't sell all of it, and

12  he still had $600,000.  You think Mr. Nurick would want to go

13  through the -- what he's gone through over 11 years?  Yeah, it

14  would be a lot easier just to write a check had he known this,

15  had he known Lyly Nguyen was going to fail him.

16           I don't begrudge the government so much because, like

17  I said, they didn't know about the installment request so all

18  they see in their tax summary is a $500 payment.  That's a

19  little insulting if you don't know what his plans are.  But

20  that's not what happened.  That's why he's not guilty.

21           Regarding Luna de Los Crestones, government counsel

22  asked Mr. Nurick whether or not he opened an account in Belize.

23  Why didn't they ask Mr. Nurick those questions?  Why are they

24  now waiting for Mr. Laffer get up when it's this man who did

25  what he did.  It's this man who has the answers.  It's this man

who has made himself available to you, ladies and gentlemen, to answer their questions so he can show you that he's not guilty. So he can show you he did not intend -- or he did intend to pay his taxes.

The government argues he had full control over Luna de Los Crestones.  The question I asked Mr. Laffer at the very end was when Mr. Nurick sends a request to Andre Tinoco to pay him for something, it's Mr. Tinoco who makes the decision of what account to pay him out of.  It would be nice if we had a piece of evidence that said *Mr. Tinoco* -- from Mr. Nurick, *Dear Mr. Tinoco, please pay me or my things I want to pay, cabinets or car or whatever, on this account.*  Then we've got some idea of Mr. Nurick's controlling Luna de Los Crestones.  But all we have here is Mr. Tinoco's request to the bank to pay Mr. Nurick. So Mr. Tinoco is making a decision of where he is going pay it, which makes sense because Mr. Nurick sold him his interest.

So where is the money going to come from?  It's going to come from Tinoco.  Mr. Nurick has accounted for his money in this case.  He has paid his taxes in this case.  He made a lot of money over this investment.  And I would submit to you he would probably give it all back not to have this experience again, but this is the man who made $200,000, the most, in his career.  He went from 19 -- when he retired all of a sudden making this money in this investment, he's over his head.  He's almost a salaried employee for most of his career.  He did some

part-time consulting, but not this kind of money.  This is a different world for him.  So he relies on experts, people who are used to dealing with people with lots of money.  Don't let the government mislead you that he's some big high-roller.  And he paid his taxes on his investments.  That Mr. Laffer established.

Whether he got money from a check, whether he wired money or he sent it, there is a record of it.  It wasn't like he went and made a personal withdrawal, and you saw a bank statement that said $25,000 taken out.  No.  You see every check has a memo to his wife, a bank account.  This man kept records.  That's not the act of someone who is wanting to intend to evade payment.

So let's focus on NG Enterprises and the money that was sent to Mr. Biber.  I will argue again that this is again irrelevant because we know that in November of 2000 he had a Power of Attorney for Installment Agreement requests.  We know in 1999 he met Lyly Nguyen and had plans to deal with his tax issues.  And you know that in November of 2000, Mr. Biber testified, that was when he talked to Mr. Nurick about this charity.  Mr. Nurick is a principle man.  There're not a lot of us left, but there's a principle.  He committed and he said it. He didn't force Mr. Biber to give him his account number.  And you have to think about it, what's going on back then?  Back then in November of 2000, Mr. Nurick is sitting on a lot of

money, more money than he'd ever seen in his life.  So giving a
hundred thousand dollars to a charity with a friend wasn't the
kind of thing that would make him give pause like it would
today.

So the idea -- and Mr. Biber tells you, and it's not
contradicted, there's no reason to doubt Mr. Biber's testimony.
He came in and testified against his friend.  *Yeah, we had this
conversation in November of 2000.*  So there's a conversation.  *I
want to give this money.  I have it here.  I'm making plenty of
money.  I would like to surprise my wife.  You like animals.
You agree to contribute.  We'll create a charity.  I have a plan
here of my Installment Agreement.  I'm going to pay my taxes.
I'm making great money on my investments.*  So really, in
Mr. Nurick's mind, giving the money to Mr. Biber has no bearing
on his intent, not until the government comes back and turns his
life upside down and shakes him and then tries to connect all
these random acts to make it sound like he intended to evade.
That's the only time he realized he had to deal with this issue.

Talk about the withdrawal of equity.  I would submit
another smokescreen.  Again, Mr. Biber told you *November of
2000, that's when we had that discussion.*  And, again, ladies
and gentlemen, go back to what was going on in Mr. Nurick's
life.  He's getting ready to move to Costa Rica.  He's handling
his affairs.  That's why he wrote -- he tells you *I wrote all
those checks in one day.  I'm getting out of here.  I am going*

*to live down here.  I am preparing to move my family, my wife to*

*Costa Rica.*  What does he do?  He goes back and forth,

investigates where he wants to live.  And so he needs cash.  And

why take cash out of his principal, his investment that's making

the great return?  It's not a sham transaction.  It's not an

attempt to evade payment.  Mr. Biber did his due diligence.

Mr. Biber is not giving anybody any money, I don't care how rich

he is.  You saw what he did.  He had his daughter look the APN

number up.  He had the CPA of his business research it.  He had

a promissory note.  He had a second deed of trust.  Mr. Biber is

not giving -- that's -- giving money away.  That's how he stayed

so rich; millions, Mr. Nurick told you.  He's not going to put

his neck on the line for this man.  That's not what happened.

And what Mr. Biber testified to is evidence.  And if the

government wants you to think otherwise, then they need to

cross-examine him on what he said to make you question his

credibility.  If they don't do it, then there is no credibility

at issue.  You are certainly free to observe him and his

demeanor and how he answers questions.  But they didn't do that.

They didn't cross-examine him or redirect to make you question

that this man was being used by my client.  The reason they

didn't do it was because there was Installment Agreement, and

there was no misuse of that relationship by my client.

And, ladies and gentlemen, why didn't they ask

Mr. Biber when he was on the stand?  *Was the money just parked*

*there*?  I mean, this is the assertion.  My client parked the

money in Mr. Biber's account.  That's what -- that's the

assertion.  Then why not ask Mr. Biber *was the money just parked*

*there to avoid payment on Mr. Nurick's tax liabilities*?  Was

that question asked?  Your memory serves better than mine, but

my memory doesn't, and the reason why it wasn't asked is because

that's not what happened.

　　　　　So I have talked to you about Luna, Ansbacher, and

Shaver Lake.  And now I'm going to the Offer in Compromise, and

there's four parts in the Offer in Compromise.  There is the

doubt of collectability, the truck, the Aztec, and Luna.  I will

be short because I have talked about all of them already, just

about.

　　　　　But as to doubt to collectability, that was

Ms. Nguyen's decision.  That was her decision to file the Offer

in Compromise.  She has no motive to mislead you.  She has every

reason to want to protect herself.  But she's also under the

penalty of perjury in this federal courthouse, and she will tell

the truth to you, and she did, and she told you that it was her

decision to advise him to file the Offer in Compromise.  With

the 433-A form, ladies and gentlemen, we know Mr. Nurick told

you, Ms. Nguyen told you that he said *I forgot the truck*.  Now

it's being used against him, even though she tells you, *Let's*

*not fix it.  Let's wait.*  We know she knew about Aztec, and

there is too many uncertainties, and she advised him to check

*no.*  The question is for the defense of reliance of counsel, did

she know?  And she knew.  She told you she knew because she said

he was confused about his status.

So, ladies and gentlemen, Bill Nurick testified, and I

submit to you that he was credible, and he is credible.  He told

you that he thought an Installment Agreement request was filed.

There is no evidence before you that would suggest that he has a

motive to not pay the government based on a tax policy, a

philosophical or ideological reason.  You have to consider that

evidence or the lack thereof as to how it goes to his intent.

You have to consider when evaluating his intent, his

history of being a taxpayer.  You have to consider that all the

transactions he took place in were recorded and opened and filed

and -- reflected on his taxes as to his intent.  You have to

consider his character when deciding his intent.  He never made

a lot money.  He was clearly over his head.  The government says

this is a world tour of money.  Ladies and gentlemen, Genesis,

if you recall, has a Forex trading investment program.  Forex is

all over the world.  That's what it is.  Don't be distracted by

the slight of hand about the use of the words.  Regardless of

where the money went, he could have written checks to the moon.

The question is what was his intent.

He went from the frying pan to the skillet with bad

advice, ladies and gentlemen, but he is a principled man.  He

told you he was a principled man, and he stands up for what he

believes in.  He did stand up and raise his hand and said *I owe*
*taxes*.  He did hire a lawyer.  But he won't be pushed around.
That much is clear, ladies and gentlemen.  He won't be pushed
around by the Department of Justice, and he won't sacrifice his
beliefs for what he believes is right, especially when he didn't
do what they say he did, especially when he was misled and given
bad advice by a lawyer and now he's expected to pay.  Imagine
that.  That you go to do the Offer in Compromise, the government
then tells you you are now going to be indicted for evasion of
tax payment -- evasion of payment of your taxes, and you look in
the Indictment, and of the things you are charged with for
evasion is the fact that your lawyer told you something, and
then to add insult to injury, the lawyer told you *wait, we will*
*correct it*.  The government intervenes, and at that point they
say, *We know that you could have corrected this, but we're going*
*to stop this process right now and we're going to use your*
*statement and your Offer in Compromise as further indicia of*
*your intent and not allow you to correct that*.  Imagine the
feeling that that feels like for Mr. Nurick.

          She neglected to file.  Mr. Nurick lost his retirement
account.  He still owes taxes.  And to boot, he is being
prosecuted for evasion of payment.  You, ladies and gentlemen,
can stop this nightmare of Mr. Nurick's.

          Now, we chose each and every one of you through the
jury selection process because we believed that you would take

your responsibilities seriously, you would follow the law and
listen closely to the evidence in this case.  Be deliberate.
Use your common sense.  You can weigh your evidence.  You don't
all have to agree.

When I sit down, the government is going to have one
last opportunity to speak to you.  Like I mentioned before, it's
their burden so they have that one more chance to talk to you.
But, ladies and gentlemen, they have the last word in this
courtroom.  But you have the last word on this case.  You be my
voice, you be Mr. Nurick's voice.  When you get back to that
jury room, you think what I would say.  You think what
Mr. Nurick would say.  Think what you would say.  Don't be
pushed around by one person or the other.  All of your beliefs
are critical to your deliberations.  If you want to stand up for
what you believe in, then you do that.  If someone persuades you
otherwise, that's your choice.  But don't be pushed around.
Because that's not I would want and certainly not what
Mr. Nurick would want.  You give this man his life back.  He has
been spending the last 11 years of what should be his golden
years waiting for this day in court, fighting for what he
believes in.  And I submit to you what the evidence supports,
what the truth supports is that he always had an intent to pay
his taxes, and that's indicated through the Installment
Agreement.

Making a mistake is not a crime.  But indicting

1    Mr. Nurick for making a mistake is.  A not-guilty verdict is the

2    only verdict in this case, and I submit to you that that's what

3    Mr. Nurick deserves under the law.  Thank you.

4          THE COURT:  Ms. Hendrickson, so we don't interrupt

5    you, I think we will take our break first.

6          Ladies and gentlemen, don't talk about the case or

7    form or express any opinions about the case until it's finally

8    submitted to you.  We will take a 15 minute break.

9                        (Recess taken)

10                        (Jury In)

11         THE COURT:  Everyone is present.

12         Ms. Hendrickson.

13         MS. HENDRICKSON:  Thank you, your Honor.

14                 *Government's Closing Argument*

15         MS. HENDRICKSON:  There are a few things that the

16   government and defense do agree on.  One, Mr. Nurick is not here

17   for any kind of mistake.  Mr. Nurick is not here based on bad

18   advice from legal counsel.  Mr. Nurick is here based on acts he

19   did deliberately.

20         As defense counsel reminded you and the judge read to

21   you, you can only rely on counsel if you fully disclose.  Full

22   disclosure is the only way an attorney can give accurate and

23   complete advice.  There is no question that Mr. Nurick did not

24   disclose his interest in Luna de Los Crestones.  He says he

25   didn't have one.

He had an interest in Luna de Los Crestones and continued to collect money from Genesis, his 36 percent a year, '99, 2000, 2001. Tony Lam didn't know about it, Lyly Nguyen didn't know about it.

If we could pull up our first slide talking about deliberate actions. In the space of five days, Ms. Grochowski goes to the bank and takes out $38,000. February 15, 2001, $20,000; February 20, 2001, $18,000. You can be sure Lyly Nguyen did not tell him to go withdraw a bunch of money out of the bank account *so you can hide it from the IRS*. She most certainly did not give him that advice. He took the cash out in anticipation of filing the Offer in Compromise.

2001, the government was able to trace over $230,000 to Mr. Nurick, and again the Offer in Compromise is filed right before here. So he doesn't even tell Ms. Nguyen that he got money in January of 2001, whether it's regarding the Installment Agreement or the Offer in Compromise. She doesn't know he is still collecting money. What I'm going to show you, in the Offer in Compromise it says *This is a final disposition. The money I reported from Genesis in 2000 is done. I am getting no more money.* That was not true.

On his 2001 1040, he only reports $11,646, and it's listed on *other income*, Aztec Irrevocable Trust. His total income is listed as 28,000.

Now, Mr. Nurick is not on trial for filing a false

1    2001 income tax return.  But it's relevant to you understanding

2    what his intent was.  What did he do on other tax returns?  What

3    other actions did he take?  Were they consistent with him trying

4    to hide information and assets from the IRS.  The government

5    submits this is indication of Mr. Nurick's willfulness in

6    evading his 1995 income taxes.

7            The Offer in Compromise.  Let's go over that.

8    Mr. Nurick claimed he had one bank account that had a thousand

9    dollars in it.  In the first part of my closing when I stood up

10   to speak with you, I showed that you wasn't true.  There was at

11   least $5,000 in it.  These are not just rough estimates.

12   Ms. Nguyen talked to him.  They exchanged faxes.  She faxed him

13   the entire 13 pages and said, *Look at all of this.  Make sure it*

14   *is right.*  Then he signed it and sent it back to her.

15           The next page, *assets and liabilities*.  We talked

16   about the equity in Shaver Lake.  Now it's down to $10,000 after

17   that deed of trust from Mr. Biber.  Monthly payments, $1,600.

18   Well, if Mr. Nurick was actually making payments on the

19   $140,000, perhaps his expenses would have been 1,600.  There's

20   no evidence of that.  Recall that that deed of trust was paid

21   back November of 2001 when that house was sold.  Mr. Nurick was

22   making no principal payments.  Now, I'll show you in a little

23   bit his mortgage payments to Bank of America were only $776.

24   This is a deliberate overstatement of his expenses.

25           Now here this was discussed with Mr. Nurick on

cross-examination that he only had a net of $18 a month, which he couldn't even live on, let alone pay the IRS even $500 a month.  He never had any intention of paying them $500 a month under an Installment Agreement or under an agreement with the Offer in Compromise.  He was trying to show that he had very little money so the IRS would accept $10,000 for a $157,000 liability.

Let's look at the part down here on the bottom.

It says 2000 tax return.  Line 33 shows $348,562. This amount comprised of $317,114 capital gain from passive investment and $31,449 ordinary income.  The capital gain was a final disposition.

Now, Ms. Nguyen was asked questions by Mr. Lombard whether that was his wording or hers.  And her answer was that based on the information he provided to her, this was her understanding of what was going on with Genesis.  He was not getting any more money.

It further says, *I already used this money to pay taxes and personal debts.  My only source of income in the future are Social Security, pension, and consulting service.* Here is the signature, Mr. Nurick, Ms. Grochowski, dated 4/19. Now, again, I tell you, use your common sense.  If you have drafts of documents going back and forth and you don't want to file something until you are back in the United States, you do not sign it.  He signed it and sent it back to Ms. Nguyen.  He

1    signed it under penalties of perjury saying it was accurate,

2    accurately reflected his income, his expenses and his assets.

3           Here are some of the checks to Bank of America in 2000

4    that show -- they are for $776.13.  This is the one mortgage

5    payment he was making regular payments on.  Not 1600; 700.

6           On the other part of the Offer in Compromise there

7    also is a collection information statement for his business,

8    Nurick & Associates, Inc.  The asset he lists down there is the

9    one checking account at Wells Fargo Bank, a thousand dollars.  I

10   just showed you those statements showed the balance was $7,000,

11   not a thousand dollars.  And when you're offering to pay the IRS

12   only $10,000, it matters a lot to them whether you have a

13   thousand or five thousand, a thousand or seven thousand.

14          The number of pages, 13.  All of the documents were

15   faxed to Mr. Nurick, not just the signature page.  He had the

16   time and the opportunity to review it all and sign it.  The

17   balances as of the Offer in Compromise, again, Luna de Los

18   Crestones, was not disclosed to Lyly Nguyen.  It was not

19   disclosed.  If he did not disclose every asset he owned and he

20   controlled, he cannot rely on her advice because she can't give

21   him accurate advice.  He hid that account from her because he

22   didn't want her to know about it and because he didn't want the

23   IRS to know about it.

24          2001 his total income, the whole year for 2001, for he

25   and his wife, $28,385.  Now, I just showed you those cash

withdrawals from February.  Those totaled $38,000.  So

Ms. Grochowski took out of the bank in cash $38,000 in one week

in February of 2001, more than he reported as income for the

entire year.  Does that make sense?  No.  What makes sense is he

had all the money from Luna de Los Crestones that we showed you

on the chart.  He was still getting money from Genesis.  He was

still controlling it.  He did not report it.  He had already

told the IRS *I don't have any money*.  This tax return he files

to be consistent with that.

          If you take his itemized deductions and his personal

exemptions, taxable income, zero, nothing, for 2001.  Again,

contrast that with the chart we provided to you, he received

over $230,000 in 2001 from Genesis.

          There has been some discussion today about I-Control

NB Trust, and Mr. Laffer, I believe, said there was no evidence

inconsistent with it being a retirement account.  The trust did

not have an EIN or a taxpayer identification number.  When the

IRS tried to look up I-Control NB Trust in their system, they

found nothing.  When they looked up tax returns, down here at

the bottom, it shows nothing is on file for I-Control NB Trust

for the years '95 through 2002.  Why?  Because that was just a

name on a bank account.  Mr. Nurick received Genesis funds into

that account at Wells Fargo Bank, '95, '96, '98, '99.  It's not

a trust.  It was an individual checking account.

          One other thing we do agree with defense counsel about

1    is that Mr. Nurick is here based on his actions, not based on

2    any mistakes, but the other issue counsel talked to you about

3    was he's been waiting 11 years, and he's been waiting a long

4    time for this.  Now, the progress of the justice system is

5    something beyond your control, my control.  The issue is what is

6    he on trial for, what are the facts?  Mr. Lombard said

7    Mr. Nurick was an honorable man.  We're not saying he's a

8    horrible person.  We are saying he took deliberate steps and

9    committed a crime.  That's what the evidence supports.  That's

10   what the evidence shows.

11          In 1904, Associate Justice Oliver Wendell Holmes said

12   *Taxes are what we pay for a civilized society*.  Our system

13   depends on people filing and paying.  The government does not

14   have enough resources to chase people down and to audit them and

15   to do criminal investigations.  But when we find evidence of

16   fraud, that somebody is intentionally evading the payment of

17   taxes, then it is the government's duty on behalf of all

18   taxpayers to come to you in a forum like this and say Mr. Nurick

19   committed a crime.  The evidence shows he committed a crime.

20   And on your review of the evidence, you will see he acted

21   deliberately.  You will unanimously agree that he committed

22   evasion of payment for 1995, and you will find him guilty.

23          THE COURT:  When you begin your deliberations, elect

24   one member of the jury as your foreperson, who will preside over

25   the deliberations and speak for you here in court.  You will

1  then discuss the case with your fellow jurors to reach

2  agreement, if you can do so.  Your verdict, whether guilty or

3  not guilty, must be unanimous.

4          Each of you must decide the case for yourself, but you

5  should do so only after you have considered all the evidence,

6  discussed it fully with the other jurors, and listened to

7  their -- to the views of your fellow jurors.  Do not be afraid

8  to change your opinion if the discussion persuades you that you

9  should, but do not come to a decision simply because other

10  jurors think it is right.

11          It's important that you attempt to reach a unanimous

12  verdict but, of course, only if each of you can do so after

13  having made your own conscientious decision.  Do not change an

14  honest belief about the weight and effect of the evidence simply

15  to reach a verdict.

16          Because you must base your verdict only on the

17  evidence received in the case and on these instructions, I

18  remind you that you must not be exposed to any other information

19  about the case or to the issues it involves.  Except for

20  discussing the case with your fellow jurors during your

21  deliberation, do not communicate with anyone in any way and do

22  not let anyone else communicate with you in any way about the

23  merits of the case or anything to do with it.  This includes

24  discussing the case in person and in writing, by phone or

25  electronic means via e-mail, text messaging or any Internet chat

1   room, blog, website or other feature.  This applies to

2   communicating with your family members, your employer, the media

3   or the press, and the people involved in the trial.  If you're

4   asked or approached in any way about your jury service or

5   anything about the case, you must respond that you've been

6   ordered not to discuss the matter and to report the contact to

7   the Court.

8         Do not read, watch, or listen to any news or media

9   accounts or commentary about the case or anything to do with it.

10  Do not do any research such as consulting dictionaries,

11  searching the Internet, or using other reference materials, and

12  do not make any investigation or in any other way try to learn

13  about the case on your own.  The law requires these restrictions

14  to ensure the parties have a fair trial based on the same

15  evidence that each party has had an opportunity to address.

16        A juror who violates these restrictions jeopardizes

17  the fairness of these proceedings, and a mistrial could result

18  that would require the entire trial process to start over.

19        If any juror is exposed to any outside information,

20  please notify the Court immediately.

21        Some of you have taken notes during the trial.

22  Whether or not you took notes, you should rely on your memory of

23  what was said.  Notes are only to assist your memory.  You

24  should not be overly influenced by your notes or those of your

25  fellow jurors.

1    The punishment provided by law for this crime is for

2    the Court to decide.  You may not consider punishment in

3    deciding whether the government has proved its case against the

4    defendant beyond a reasonable doubt.

5    A verdict form has been prepared for you.  After you

6    have reached unanimous agreement on a verdict, your foreperson

7    should complete the verdict form according to your

8    deliberations, sign and date it, and advise the bailiff that

9    you're ready to return to the courtroom.

10    If it becomes necessary during your deliberations to

11    communicate with me, you may send a note through the bailiff

12    signed by any one or more of you.  No member of the jury should

13    ever attempt to communicate with me, except by a signed writing,

14    and I will respond to the jury concerning the case only in

15    writing or here in open court.  If you send out a question, I

16    will consult with the lawyers before answering it, which may

17    take some time.  You may continue your deliberations while

18    waiting for the answer to any question.

19    Remember that you are not to tell anyone, including

20    me, how the jury stands numerically or otherwise on any question

21    submitted to you, including the question of the guilt of the

22    defendant, until after you have reached a unanimous verdict or

23    have been discharged.

24    Brief sidebar, please, with counsel.

25    (Sidebar conference commenced.)

```
 1              THE COURT:  I forgot to ask, is it okay if we excuse
 2    the alternates and just keep them on call, or do you want to
 3    have them come in?
 4              MR. LOMBARD:  That's okay.
 5              MS. HENDRICKSON:  That's fine.
 6                   (Sidebar conference ended.)
 7              THE COURT:  I am going to ask the alternates, when I
 8    tell you to wait out in the hall, Ms. Plato will come and give
 9    you some instructions.  We're going to ask you to remain on
10    call -- that is, you have to be available to get here relatively
11    quickly, half an hour or so if we need you to substitute in for
12    one of the other jurors, but we won't make you come back every
13    day and sit here while the jury is deliberating because
14    alternates don't go back into the jury room.
15              The first thing I'll ask our jurors do is to let us
16    know what you'd like your schedule to be.  You can stay today
17    until 2:00 or you can stay longer, if you'd like.  And tomorrow
18    you can do the 8:00 to 2:00 schedule or you can deliberate for a
19    longer period of time and take a lunch break if you'd prefer
20    that.  We need you to spend about a good six hours so we can
21    legitimately tell your employers that you were serving jury duty
22    all day.  Tomorrow is the day I have a meeting at lunch so you
23    can certainly continue to deliberate, but if you came -- if you
24    reached a verdict during that period of time, then you'd have to
25    wait for me to get back from my meeting to take it, so you can
```

1   consider that in your evaluation of what your schedule should

2   be.

3          Ms. Plato and the lawyers are working on gathering the

4   exhibits together to get them to you.  You will have the verdict

5   form, and my secretary is out copying all sets of jury

6   instructions for you, and we will be getting that back to you

7   just as soon as we can, so don't send out a note saying *when are*

8   *we getting stuff*.  We are working as hard as we can to get it

9   ready for you.

10         Ms. Plato, would you swear in our bailiff.

11         THE CLERK:  Yes, your Honor.

12                         Bailiff sworn

13         THE COURT:  Thank you.

14         Our alternates can wait out in the hall.  Ms. Plato

15   will come give you some instructions.  If you have stuff in the

16   jury room to pick up, you can get that first and then just wait

17   outside.

18                         (Jury Out)

19         THE COURT:  We'll wait until the jury lets us know

20   what their schedule will be, and then I'm not sure where you

21   guys are even staying.  Are you going to be at the U.S.

22   Attorney's office or are --

23         MS. HENDRICKSON:  We will probably hang around.

24         THE COURT:  Make sure we have your cell phones so

25   Ms. Plato can contact you.

1              And, Mr. Lombard, what's your plan?

2              MR. LOMBARD:  Be available to the Court.

3              THE COURT:  How far away are you?

4              MR. LOMBARD:  Well, my office is in Santa Monica, but

5     I will be here during the time that the jury is deliberating.

6              THE COURT:  Okay.  Make sure Ms. Plato has a good way

7     to contact you.

8              Also oftentimes the jury sends out a note with

9     something like *we need markers for the board* or *we need Post*-Its

10    or something like that.  If you don't have any objection to that

11    type of question, I will just send them the markers or the

12    Post-Its.  Anything even colorably substantive, I'll get you

13    here if that's all right, Mr. Lombard?

14             MR. LOMBARD:  That's okay with me.

15             THE COURT:  You wanted to make a motion, I assume?

16             MR. LOMBARD:  Yes, your Honor.  I do.

17             I would submit that viewing the evidence in the light

18    most favorable to the government and having heard the testimony

19    and reviewed the documents, specifically with the issue of the

20    Installment Agreement and the testimony of Lyly Nguyen, that the

21    government hasn't carried their burden.  And even when you view

22    it in its light most favorable, certainly Mr. Nurick had the

23    intent to pay through an Installment Agreement.  He hired a

24    lawyer.  His lawyer testified to that advice that she gave him.

25    He disclosed the information to her, and to the extent that even

1    if the Court were to say well, let's view the evidence in the

2    light most favorable and that he owns Luna de Los Crestones, it

3    doesn't negate the point of his intent to pay through an

4    Installment Agreement.  And now, that might go to the issue of

5    Offer in Compromise and whether or not it was included, but I

6    would submit that there is nothing contradicting Mr. Nurick's

7    use of a lawyer to file the Installment Agreement request.  His

8    lawyer didn't do it.  She didn't recall having not done it, but

9    she certainly agreed and it's uncontradicted that that's her

10   that filled out the form, and it's his signature and his wife's

11   signature.  So I would submit on that.

12          THE COURT:  From the government?

13          MS. HENDRICKSON:  Your Honor, the evidence in the

14   light most favorable to the government, the government has

15   proved that Mr. Nurick committed several affirmative acts of

16   evasion.  The government has proved through the bank records and

17   through the testimony that Luna de Los Crestones was a bank

18   account that he was controlling, that he was freely spending.

19   He admitted to that.

20          Ms. Nguyen's testimony, I think, regarding the

21   Installment Agreement must be taken in context with everything

22   else.  There was an Installment Agreement dated January of 2001.

23   The Offer in Compromise was dated in April of 2001.  There are a

24   lot of things going back and forth, and I think it's --

25   certainly at this point in the case it would be incorrect to

isolate only the Installment Agreement and say that you could

ignore the rest of the other evidence and say that Mr. Nurick

relied on Ms. Nguyen.  I think the testimony and the documents

show that that's not the case and that Mr. Nurick did

intentionally commit tax evasion, and the jury should be

permitted to decide.

THE COURT:  My only question at this point -- and I

would either deny the motion or simply take it under submission,

but my only question at this point is with regard to the

Affirmative Act No. 5, and is that the -- I should say 5-2.  Is

that what she was allegedly giving him -- I shouldn't say

*allegedly*.  I'm not sure if you're drawing a distinction between

the advice on the bank account versus the trust because the

question on the form, I think, was a slightly different form --

was related to a trust as opposed to a bank account.  So I'm not

sure what the government's position is on that.

MS. HENDRICKSON:  Your Honor, on the Offer in

Compromise, there were two separate sections.  There was the

19-F where he was asked and checked *no*, and there was discussion

and testimony by Ms. Nguyen and by Mr. Nurick about his

confusion over the ownership of the trust itself.  Ms. Nguyen

was very clear that she did not know about the bank account in

the name of Aztec.

THE COURT:  Mr. Lombard?

MR. LOMBARD:  That was it.  Just for the record, it

```
 1   was a Rule 29 motion.  I'm sure the language makes it clear --

 2           THE COURT:  Yes.

 3           MR. LOMBARD:  -- but the Court invited me to make a

 4   motion, and I'm making a Rule 29 motion.

 5           THE COURT:  I'll take that under submission.

 6           And you'll all just -- one person from each side will

 7   stay here until we have the note from the jury with their

 8   schedule, and Ms. Plato will let me know when we have that.

 9                        (Recess taken)

10           THE COURT:  The jury has indicated that they will stay

11   until 2:00 p.m. today, and then the schedule for the rest of the

12   week will be 8:00 a.m. until 2:00 p.m., so make sure you're not

13   too far away until 2:00 today.  And then we'll expect Ms. Plato

14   will be able to get hold of you quickly if we need you from 8:00

15   to 2:00.  And then at the end of each day, even if it's 2:00, do

16   not leave until you call Ms. Plato and verify that the jury has

17   gone.  Thank you.

18           (Jury deliberated from 1:03 p.m. to 2:05 p.m.)

19

20           (Proceedings adjourned at 2:05 p.m.)

21

22

23

24

25
```

*CERTIFICATE OF OFFICIAL REPORTER*

*COUNTY OF LOS ANGELES )*
*                       )*
*STATE OF CALIFORNIA   )*


*          I, Pamela A. Batalo, Federal Official Realtime Court*

*Reporter, Registered Professional Reporter, in and for the*

*United States District Court for the Central District of*

*California, do hereby certify that pursuant to Section 753,*

*Title 18, United States Code, that the foregoing is a true and*

*correct transcript of the stenographically reported proceedings*

*held in the above-entitled matter and that the transcript page*

*format is in conformance with the regulations of the Judicial*

*Conference of the United States.*


*Date:  June 1, 2012*



*/s/ Pamela A. Batalo*
*_____*
*Pamela A. Batalo, CSR No. 3593, FCRR, RMR*
*Federal Official Court Reporter*

INDEX FOR SEPTEMBER 13, 2011


INDEX OF WITNESSES


WITNESSES:                                                    PAGE

MARTIN G. LAFFER
  DIRECT EXAMINATION BY MR. LOMBARD                             9
  CROSS-EXAMINATION BY MS. HENDRICKSON                        41
  REDIRECT EXAMINATION BY MR. LOMBARD                         61
  RECROSS-EXAMINATION BY MS. HENDRICKSON                      63
  REDIRECT EXAMINATION BY MR. LOMBARD                         65




GOVERNMENT'S OPENING ARGUMENT                                 75

DEFENSE CLOSING ARGUMENT                                      97

GOVERNMENT'S CLOSING ARGUMENT                                129